**UNITED STATES of America**

v.

**BELL PETROLEUM
SERVICES, INC., et al.**

No. MO–88–CA–05.

United States District Court,
W.D. Texas,
Midland–Odessa Division.

March 8, 1990.

James E. Ross, Houston, Tex., for Southern American Ins. Co.

Eugene B. Labay, Thomas A. Countryman, Kevin M. Beiter and Walter J. Batla, Cox & Smith, Inc., San Antonio, Tex., and Gerald P. Keith, H. Christopher Mott and Leslie M. Luttrell, Ginnings, Birkelbach, Keith & Delgado, El Paso, Tex., for Bell Petroleum Services, Inc.

W.B. Browder, Jr., Stubbeman, McRae, Sealy, Laughlin & Browder, Inc., Midland, Tex., for Regal Intern., Inc.

Michael T. Morgan, Morgan & Ward, Midland, Tex., for John R. Leigh.

James B. Harris and Scott D. Deatherage, Thompson & Knight, Dallas, Tex., for Chromalloy American Corp. and Sequa Corp.

R. Brent Cooper, Michael W. Huddleston and Judith H. Winston, Cowles & Thompson, Dallas, Tex., for Puritan Ins. Co.

David C. McCue, Maloney & Smith, Dallas, Tex., and Walter J. Batla, Cox & Smith, Inc., San Antonio, Tex., for Ranger Ins. Co.

Marc Randall May, Odessa, Tex., for Eddie Wright.

Eddie Wright, Odessa, Tex., pro se.

William R. Barnes, Odessa, Tex., for NIPCO, Inc.

Jack Q. Tidwell, McMahon, Tidwell, Hansen, Atkins & Fowler, P.C., Odessa, Tex., for Stell Chrome, State Farm Fire and Cas. Co. and Trinity Universal Co.

Stewart McKeehan, Browning & McKeehan, Odessa, Tex., for Spearman Radiator and Supply and Dudley's Radiator.

Jack Q. Tidwell and Michael Douglas Atkins, McMahon, Tidwell, Hansen, Atkins & Fowler, P.C., Odessa, Tex., for Triple H. Chrome Plating.

Winstanley F. Luke, U.S. Atty's Office, San Antonio, Tex., and Thomas R. Bartman, U.S. Dept. of Justice, Washington, D.C., for Small Business Admin.

Michael Lowenberg, Steven M. Morgan and Jeff Glass, Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., for Kerr–McGee Corp.

Nancy S. Nowak, U.S. Trustee's Office, Winstanley F. Luke, U.S. Atty's. Office, San Antonio, Tex., Barbara A. Finamore, U.S. Dept. of Justice, Washington, D.C., Harry Kelso, Peter R. Mounsey and Craig E. Johnson, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., and Thomas R. Bartman, U.S. Dept. of Justice, Washington, D.C., for U.S. E.P.A.

Marc A. Sheiness and Jose A. Berlanga, Hirsch, Glover, Robinson & Sheiness, Houston, Tex., for Southland Royalty Co.

Max Edwin Wright, Cotton, Bledsoe, Tighe & Dawson, P.C., Midland, Tex., for Phillips Petroleum Co.

Timothy D. Yeats and Richard L. Palmer, Little, Palmer & Williams, Big Spring, Tex., for Pacific Indem. Co. and Chubb and Son, Inc.

William M. Kerr, Kerr, Fitzgerald & Kerr, Midland, Tex., and John G. Niles and Ralph W. Dau, O'Melveny & Myers, Los Angeles, Cal., for Cigna Property Cas. Ins. Co.

Russell S. Johnson, Donald D. Gavlick and Mary T. Mishtal, Sawtelle, Goode, Davidson & Troilo, San Antonio, Tex., for U.S. Fire Ins. Co.

George V. Basham, III, Lloyd, Gosselink, Ryan & Fowler, Austin, Tex., and Thomas Butler Alleman, Niewald, Waldeck, Norris & Brown, Houston, Tex., for Granite State Ins. Co.

Donald Warner Griffis, Griffis & Griffis, San Angelo, Tex., for Republic Ins. Co.

## MEMORANDUM OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

BUNTON, Chief Judge.

BEFORE THIS COURT are cross Motions for Summary Judgment filed by the Plaintiff and by collective Defendants Sequa and Chromalloy (hereinafter referred to as "Sequa"). The issue before the Court is whether the recovery costs incurred by the Government in its initial response to the chromium contamination found in the Trinity Aquifer underlying the "Chromium I Site" in Odessa, Texas are consistent with the National Contingency Plan. This Court, on September 20, 1989 and November 9, 1989 found Defendants Bell, Sequa and John Leigh liable for the Government's Response Costs under § 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* The question now before the Court was reserved for "Phase II" of the proceedings. Having reviewed the voluminous Motions of the parties and the various responses thereto, the Court is of the opinion that the response costs incurred by the Government in this case were in fact consistent with the National Contingency Plan and Summary Judgment should be granted for the Plaintiff. The Court shall reserve its ruling, however, on the exact amounts of some of the Government's costs pending the filing of affidavits by the Government, Sequa, Bell and Leigh.

## BACKGROUND

This suit originated in the United States Bankruptcy Court as a bankruptcy petition styled *In re Bell Petroleum Services, Inc.* The Government filed as a creditor and Bell objected to its alleged liability for response costs incurred by the Government at the Chromium I Site (the "Site"), Odessa, Texas. A joint Motion for Withdrawal of Bankruptcy Reference was signed by Judge Glen Ayers in June of 1988. In December of 1988, this Court granted the Government's Motion to bring into the action all of the Potentially Responsible Parties.

The controversy at bar involves the initial response of the State of Texas to citizen complaints of discolored water around the Site in Odessa, Texas. The State commissioned studies of the area and determined that the Trinity Aquifer which flows underneath the 24–block Site was a potential source of contamination.

In September of 1984, the Environmental Protection Agency (the "EPA") authorized a response action at the Site pursuant to its authority under Section 104(c) of CERCLA, 42 U.S.C. Section 9604(c). On the same date, EPA entered into a cooperative agreement with the State of Texas whereby the State was to undertake forward planning at the Site and to perform a remedial investigation, a feasibility study and remedial design work for the Site. EPA would then reimburse the State for these costs.

The remedial investigation revealed that the disposal of chromium waste at 4318 Brazos Street had severely contaminated the Trinity Aquifer, which provides water

to residences and businesses beyond the Odessa City Limits, with chromium. The contaminants now extend north and northwest from 4318 Brazos Street because of the flow of the groundwater in the area. Chromium is a "hazardous substance" as that term is defined in CERCLA. 42 U.S.C. Section 9601(14).

EPA, as required by CERCLA, maintained a position of oversight, but still participated in planning the State's studies and remedial design of the alternate water system at the Site. EPA then reviewed these activities and memorialized them in reaching its Record of Decision which approved the State selected alternate water system response. Finally, as per the agreement, EPA reimbursed the State's costs by a letter of credit with the State of Texas on August 27, 1987. Section 107 of CERCLA, 42 U.S.C. Section 9607, authorizes EPA to seek reimbursement of these payments from persons responsible for contamination at the Site.

On December 1, 1988 and with permission of the Court, the Government filed a Complaint against, among others, Bell, Sequa and Leigh based on Section 107 of CERCLA.

### STANDARD ON MOTION FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Rule 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.

Thus, the focus of this Court is upon disputes over material facts; facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment. *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Phillips Oil Co. v. OKC Corp.,* 812 F.2d 265, 272 (5th Cir.1987), *cert. denied,* 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987), and the cases cited therein.

The Supreme Court's 1986 trilogy of summary judgment cases clarified the test for granting summary judgment. In *Anderson v. Liberty Lobby,* the Court stated that the trial court must consider the substantive burden of proof imposed on the party making the claim. In the case before this Court, the Government has the burden with respect to its claims; the Defendants have the burden with respect to certain defenses they raise. The Court in *Anderson v. Liberty Lobby* defined "material" as involving a "dispute over facts which may affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby* requires this Court to substantively evaluate the evidence offered by the moving and non-moving parties to determine whether the evidence raises a "material" fact question which is "genuine."

In a second case, the Supreme Court reiterated that where the party moving for summary judgment has established *prima facie* that there is no genuine issue as to any material fact, the non-moving party must then come forward with "specific facts" showing a genuine issue for trial. It must be "more than simply ... that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A third case, *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) held that where the moving party shows that the opposing party is unable to produce evidence in support of its case, summary judgment is appropriate. In *Celotex Corp.,* it was not necessary for the motion for summary judgment to be supported by affidavits or other material specifically negating the non-moving party's claim so long as the District Court was satisfied that there was an absence of evidence to support it. At that point the burden shifted to the non-moving party to

produce evidence in support of its claims; if it did not produce any, summary judgment was required.

This Court has demonstrated its willingness to allow non-moving parties their day in court in borderline cases where under governing law or reasonable extensions of existing law, the hearing of some testimony would be helpful to understand the proper application of the law. Such is not the case in the suit *sub judice*. Accordingly, the Court shall grant the Government's Motion in and allow for additional briefing where necessary.

## DISCUSSION

In its Motion, the Government supplies this Court with the a figure of $1,628,-142.89, representing the costs incurred by the Government in responding to the contamination found under the 24–block site known as the Chromium I Site (the "Site"). Persons found to be an owner or operator of a site where hazardous substances have been deposited are statutorily liable for:

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; ....

The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D). Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned.

Superfund Amendments and Reauthorization Act ("SARA"), 42 U.S.C. § 9607(a)(4) (Supp.1989). *See also:* SARA, 42 U.S.C. § 9601(9) (Supp.1989). SARA further provides:

(1) Limitation

In any judicial action under this chapter, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record. Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court.

(2) Standard

In considering objections raised in any judicial action under this chapter, the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law.

(3) Remedy

If the court finds that the selection of the response action was arbitrary and capricious or otherwise not in accordance with law, the court shall award (A) only the response costs or damages that are not consistent with the national contingency plan (sic), and (B) such other relief as is consistent with the National Contingency Plan.

(4) Procedural errors

In reviewing alleged procedural errors, the court may disallow costs or damages only if the errors were so serious and related to matters of such central relevance to the action that the action would have been significantly changed had such errors not been made.

42 U.S.C. § 9613(j) (Supp.1989). In discussing the costs incurred, the Court shall review each of the objections made by Sequa in its Motion and Responses and by Bell in its Response to the Government's Motion for Summary Judgment.

## DEFENDANTS' OBJECTIONS

In Sequa's Motion for Summary Judgment as to the Invalidity of EPA's Implementation of an Alternate Water Supply, Sequa argues:

1. EPA's decision to implement an alternate water supply must be set aside because of the failure of EPA to consider

certain relevant factors, and because there is no rational connection between the facts found and the decision made.

2. The decision to implement an alternate water system is not cost effective in comparison to the "no action" alternative.

3. EPA's decision to implement the extension of city water is invalid because the focused feasibility study failed to consider the alternative of supplying bottled water to users of wells producing groundwater affected by chromium.

4. The process followed by EPA in deciding to implement an alternate water system was fundamentally flawed and requires EPA's decision to be set aside.

Additionally, the following arguments are found in Sequa's Reply to the United States' Motion for Summary Judgment on Costs:

5. A determination of the response costs, if any, EPA can recover from Defendants must be based on the evidence presented to the Court in a de novo proceeding.

6. EPA's Motion for Summary Judgment incorrectly suggests the standard for reviewing whether the agency selected the proper remedy also serves to establish whether the costs of reaching and implementing that decision are consistent with the National Contingency Plan ("NCP").

7. The response costs EPA seeks to recover in this action are not consistent with the NCP because of the absence of adequate accounting or documentation concerning such costs.

8. CERCLA does not provide EPA with the authority to recover its indirect costs or those of the Texas Water Commission ("TWC").

9. The costs associated with the DOJ's involvement at this site either should be denied in toto or apportioned between the two cases joined in this consolidated proceeding.

10. A variety of disputed facts exist with respect to the actual costs incurred that prevent the granting of a Motion for Summary Judgment

11. EPA's request for pre-judgment interest must be denied because EPA failed to observe the procedural prerequisite established by Congress.

Each point shall be discussed seriatim.

## THE ALTERNATE WATER SUPPLY DECISION

The first issue raised by Sequa is the decision to connect the citizens affected by the chromium plumes to an alternate water source, namely an extension of water from the City of Odessa lines was not rational for two reasons: (a) no one drank the groundwater affected by chromium and (b) no health threat was posed by the chromium in the groundwater. Defendant Bell Petroleum Services, Inc. ("Bell") also raised this issue in its Response to the United States' Motion for Summary Judgment and included the argument that with or without the chromium levels, the water was not fit for human consumption.

■ In order for this Court to disallow recovery of the Government's claimed response costs, the Defendant bears the burden of demonstrating that the agency's choices of response actions were arbitrary and capricious. *United States v. Northeastern Pharmaceutical and Chemical Co.* ("NEPACCO"), 579 F.Supp. 823 (W.D. Mo.1984), *aff'd in part and rev'd in part on other grounds,* 810 F.2d 726 (8th Cir. 1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *U.S. v. Hardage,* 733 F.Supp. 1424 (W.D.Okla.1989) (order granting Plaintiff's motion for partial summary judgment on response cost issues, denying summary judgment for Department of Justice's (the "DOJ's") indirect costs, ordering refund, if appropriate, and declaring liability for future response costs); *U.S. v. Mottolo,* 695 F.Supp. 615 (D.N.H.1988); *O'Neil v. Picillo,* 682 F.Supp. 706 (D.R.I.1988).

■ The Court is of the opinion Defendants have not met their burden. As pointed out by the Government, regardless of the number of residents who said they did not drink the contaminated water, the Government had no guaranty that those

who move into the area in the future will not consume the water. Nor does the Government have any guaranty that those citizens who claim to not drink the water do not use tap water for cooking, bathing and other activities which could bring the contaminated water into their bodies. Further, this Court is of the opinion that the Government's decision not to supply bottled water to the residence within the contaminated area was not arbitrary or capricious. The Government found that "Supplying bottled water, over a 15 year design life, would be labor and cost intensive; therefore, [it] was not considered a viable alternative." Administrative Record at page 3168. For these reasons, this Court is not convinced that the mere fact those citizens who could be reached for comment responded they did not drink the water proves the Government's actions arbitrary and capricious. To the contrary, the Court is of the opinion the Government was correct in deciding to take every precaution lest an unwary citizen suffer some ill effect from the contamination for which the Defendants are responsible.

■ Defendants next claim an alternate water source was an arbitrary and capricious decision because chromium does not pose a threat to human life. Again, this Court finds Defendant Sequa's reasoning unappealing. In making its assessments of the situation in 1986, the Government was compelled by the NCP in effect at the time to follow the standards set in the Safe Drinking Water Act (the "SDWA"), 42 U.S.C. § 300f *et seq.* Chromium is one element for which maximum concentration limits ("MCLs") were set under the SDWA. Further, Section 9621(d)(2) of SARA states:

With respect to any hazardous substance, pollutant or contaminant that will remain on site, if—

(i) any standard, requirement, criteria, or limitation under any Federal environmental law, including, but not limited to ... the Safe Drinking Water Act ... is legally applicable to the hazardous substance or pollutant or contaminant concerned ... the remedial action selected under section 9604 of this title or secured

under section 9606 of this title shall require, at the completion of the remedial action, a level or standard of control for such hazardous substance or pollutant or contaminant which at least attains such legally applicable or relevant and appropriate standard, requirement, criteria or limitation. Such remedial action shall require a level or standard of control which at least attains Maximum Contaminant Level Goals established under the Safe Drinking Water Act ... where such goals or criteria are relevant and appropriate under the circumstances of the release or threatened release.

42 U.S.C. § 9621(d)(2)(A) (Supp.1989).

The Government found twelve of the fifteen wells tested had chromium levels at or above the MCL for chromium. Further, nine of these twelve met or exceeded the higher Recommended MCLs for chromium proposed by EPA in the Federal Register of November 13, 1985. Administrative Record at 3146. This Court finds the Government's use of the SDWA maximum concentration limits in making it's determination the chromium levels in the water were dangerously high was reasonable under the circumstances and neither arbitrary nor capricious. It is also clear to this Court that regardless of the current scientific thought on the amount of chromium which may be ingested by a human before harmful effects occur, CERCLA demonstrates Congress' intent that the MCLs listed in the SDWA be the standards by which EPA judges the potability of water at any given Superfund site.

■ Finally, this Court turns to Bell's argument that regardless of the amount of chromium therein, the water already exceeded SDWA limits for nitrate. As the Government pointed out, however, Bell did not convert the nitrate readings in the Administrative Record (p. 3393) to nitrate as nitrogen, which conversion demonstrates the nitrate readings for two of the three wells tested for general quality are below the MCL found in the SDWA. One well tested above the MCL for nitrate. This Court agrees with the Government's position a single reading of elevated nitrates

does not make the Government's decision to install an alternative water source arbitrary or capricious.

## COST OF ALTERNATE WATER SYSTEM V. NO ACTION

 The second argument championed by Sequa is a comparison of the alternate water system and the "no action" alternatives sheds light on the ineffectiveness of the alternate water system. In light of the reasons stated above, this Court does not agree. Naturally a "no action" alternative will always prove to be the more cost effective of two choices where the other choice involves incurring costs. Although residents in the affected area denied drinking the contaminated water, these responses must be viewed in light of the fact many of the residents were opposed to being annexed to the City of Odessa and extension of Odessa's water wells would prompt such a result. As discussed above, this Court agrees with the Government that reliance on the residents' affirmation they would not drink the water gave the Government no comfort that in fact contaminated water would not be ingested in the next 12 to 15 years, whether by mistake, necessity or through other means such as use of water in cooking, for bathing, etc. Therefore, this Court is of the opinion the selection of the alternate water source over the "no action" option was prudent and neither arbitrary nor capricious.

## THE BOTTLED WATER ALTERNATIVE

Sequa's third argument is the focused feasibility study failed to consider the alternative of supplying bottled water to users of wells producing ground water affected by chromium. Again, as noted above, the administrative record reflects consideration of supplying bottled water to the residents of the affected area, but the bottled water option was tabled because it was labor and cost intensive over the expected 15 year life of the project. This Court therefore finds Sequa's third point not well taken.

## EPA'S DECISION MAKING PROCESS

 Sequa next argues the process followed by the EPA in deciding to implement an alternate water system was fundamentally flawed and therefore should be set aside. Sequa opines EPA violated the requirements of the NCP by selecting a remedy in advance of completion of the Remedial Investigation and EPA's failure to properly consider and evaluate public comments requires its decision to be set aside. This Court disagrees.

As outlined by the Government and documented in the Administrative Record, EPA solicited public comment on the Focused Feasibility Study from July 30, 1986 to August 27, 1986. (Record at 3115). Numerous responses were received (Record at 3107–3128), including memoranda from Sequa (Record at 3113, 3190) and Bell (Record at 3126). On August 13, 1986, EPA called a public meeting in Odessa, Texas, at which time EPA explained the findings of the study and took oral comments. The transcript of such meeting is part of the Administrative Record at 3031–3096. In the investigation by ERM Southwest, Inc. authorized by Bell and Sequa, ERM suggested that a three-inch main water line (as opposed to the EPA's proposed eight-inch main) from the Odessa water system "would be the most easily implemented and most cost effective alternative." Record at 3123. The conclusions of ERM Southwest, Inc. were submitted to the EPA by Sequa. In the EPA's Record of Decision of September 8, 1986, the EPA responded to the various questions raised in responses and comments at the August 13 meeting. Record at 3129–3170. In response to the 3–inch pipeline suggestion, the EPA noted that the City of Odessa requires 8–inch lines unless otherwise negotiated. Record at 3169. See also Record at 2566. Thus, this Court is of the opinion that the record reflects adequate solicitation by the EPA of public comment as well as a concerted effort to respond to questions and concerns. To fault the EPA for missing a question or two does not comport with this Court's sole task of reviewing the record for arbitrary or capricious conduct.

As for Sequa's complaint about the decision to implement the alternate water system, this Court is of the opinion Sequa's point is not well taken. The fact EPA began negotiations with the State of Texas for a cooperation agreement does not convince this Court the EPA had in fact made a final decision to implement the alternative water source option. Any decision making process is, by the nature of the action, fluid and malleable. Regardless of any preliminary actions on the part of the EPA, the Court notes from the record efforts were made to contact the public, answer their questions and make these actions a part of the record. This Court refuses to go through each date and each action of the EPA with a fine-toothed comb since Sequa was given the opportunity to conduct the Remedial Investigation and Feasibility Study itself, which it declined to do. From that point, CERCLA dictates this Court review EPA's actions under an arbitrary or capricious standard. Alleged procedural errors trigger disallowance of costs "only if the errors were so serious and related to matters of such central relevance to the action that the action would have been significantly changed had such errors not been made." 42 U.S.C. § 9613(j)(4). This Court finds no evidence that had the EPA started the initial negotiations at a later date, the selection of a remedial option would have been any other than the alternate water source remedy.

### DE NOVO REVIEW OF EPA'S RESPONSE COSTS

Sequa next argues, and the Government concurs, the standard for review of whether the EPA actually incurred certain costs is *de novo* rather than arbitrary and capricious. This Court agrees. Sequa does not, however, contend certain costs were not in fact incurred. Instead, Sequa argues costs incurred should not have been so incurred or are not recoverable under CERCLA. Thus, the *de novo* standard of review, although applicable to "actual costs" challenges, fails to stave off summary judgment when the challenge goes to the "reasonableness" of the costs incurred.

### STANDARD OF REVIEW FOR COSTS

Sequa next seeks to distinguish the EPA's costs of decision (i.e. the Remedial Investigation and Feasibility Study Costs) and costs of implementation (i.e. costs associated with installation of the water lines). As pointed out by Sequa, in order for the Government to recover its decision and implementation costs, the underlying decision on the appropriate remedy must not be arbitrary or capricious. 42 U.S.C. § 9613(j)(2). This Court found the decision to implement the alternate water supply was neither arbitrary nor capricious. Sequa then points to the language of Section 107 which holds responsible parties, such as Bell, Sequa and John Leigh, liable for:

(A) all costs of removal or remedial action incurred by the United States Government or a State ... not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan

42 U.S.C. § 9607(a)(4)(A), (B). Sequa then argues the process that led to the decision to implement an alternative water source must be consistent with the NCP, the costs of the decision-making process must be reasonable and necessary and the costs must have been incurred due to the release from the Odessa I Site.

This Court disagrees with Sequa's premise the Government's costs must be shown to be reasonable and necessary. Subsection B of Section 9607 refers to costs incurred "by any other person." This Court reads such language to apply to costs incurred consequent to private party cleanup actions, *not* EPA response costs. Thus, the Government need only maintain consistency with the NCP to recover its costs under a CERCLA action.

Taking a broader look at the purposes behind CERCLA, the Court does not find therein Congress' desire to allow a responsible party to sit back and watch the Government sift through the rubble of a polluted site, formulate a remedial solution and take action and then attack every cost

associated therewith. This Court is of the opinion gross misconduct on the part of the Government could bar recovery. Yet the Court keeps in mind the fact the wrong-doers herein had the option of taking responsibility for their own actions at the outset, which, had they done so, would unquestionably have limited certain costs. Our Government, God bless her, is a bureaucratic monster which, by definition, runs inefficiently. Forcing the Government's hand at the Chromium I Site naturally increased costs because the EPA had to gear up its various support staffs and offices, reconstruct the entire scenario of the chromium dumping and then begin the arduous process toward recovery including the infamous study, comment period, etc. Many, many costs would have been unnecessary had the Defendants shouldered the burden and sought to quickly and efficiently clean up the mess they made. Instead, their free ride has increased costs exponentially, including all the bureaucratic expenses typical of a large Government, costs of discovery and trial, Court costs ... the list is unending. For the Defendants to come to the Court now with white gloves and complain of dust is, in this Court's opinion, unbecoming of any member of this society. In a free country such as ours, all citizens owe a duty to take responsibility for their actions.

■ The Court reiterates the Government is not free from sin. Yet, as Section 113 of CERCLA indicates, it is only when inequities rise to a level of gross misconduct that a Court should consider taking away the Government's right to reimbursement. Defendants chose to pay the piper after the dance and, the dance now concluded, they seek to extricate every sour note along the way from the fee. This Court finds that Defendants have not shown arbitrary or capricious decisions or pointed to specific costs that are not in keeping with the NCP.

## ABSENCE OF ADEQUATE ACCOUNT-ING DOCUMENTATION

Sequa next argues absence of proper accounting documentation should bar any recovery by the Government for its response costs. In discussing this point, the Court turns to the NCP, 40 C.F.R. § 300, *et seq.*, which states:

(a) During all phases of response, documentation shall be collected and maintained to support all actions taken under this Plan, and to form the basis of cost recovery. In general, documentation shall be sufficient to provide the source and circumstances of the condition, the identity of the responsible parties, accurate accounting of Federal or private party costs incurred and impacts and potential impacts to the public health and welfare and the environment.

40 C.F.R. § 300.69. Sequa points to the fact that time sheets maintained by the contractors, EPA personnel and TWC personnel lack a description of the tasks performed and the tasks described in the contractual scope of the work between the TWC and International Technologies Corporation ("IT Corporation") do not correspond to the description in IT Corporation's invoices. The Court notes the extensive accounting documentation attached to the affidavit of Randy Cunningham, which affidavit supplements the Government's Motion for Summary Judgment. The accounting summaries used by the Government reflect the man hours expended and the rate per hour and were submitted in lieu of extensive documentation as requested by Sequa. The Court notes the underlying records have been made available to the Defendants by the Government and thus, forcing the Government to go to the additional expense of compiling more detailed summaries would only increase costs unnecessarily.

■ Further, failure to provide descriptive documentation does not make the Government's accounting inaccurate even if it did, disallowance of costs for that reason is too harsh a sanction for the omission, if any, involved. Sequa is at liberty to inspect the Government's records at any time for flaws in the figuring but the underlying remedy has been found by this Court to be consistent with the NCP and "reasonableness" is not a factor. As for

specific instances of incongruity between the scope of work to be performed by IT Corporation for TWC and the description of work in the invoices submitted by IT Corporation, this Court is of the opinion Sequa and the Government shall submit a joint work sheet of those expense items upon which they can agree and those items in dispute with reasoning for each of their respective positions within thirty (30) days of the date below. The Court shall withhold its ruling on the issue until that time.

### INDIRECT COSTS

■ Sequa then argues indirect costs are not recoverable under CERCLA. Indirect costs are those costs generally necessary to support the work performed by the EPA and the DOJ on Superfund sites, but which are not directly allocated to specific cases. The Court finds disingenuous Sequa's position CERCLA's silence on indirect costs is dispositive. In order for the Government to promptly remedy hazardous situations discovered across the country, it must necessarily maintain offices and support staff on a continuous basis. To create staffing and offices for each Superfund site would unnecessarily increase costs for each site. Further, the Government contracted with the accounting firm of Ernst & Whinney to provide an accounting method for computing those indirect costs reflecting administrative costs proportional to services rendered to a specific Superfund site. That method is described in detail in the affidavit of William Cooke attached to the Government's Motion for Summary Judgment.

Several courts have upheld the Government's claim for indirect costs, citing the broad remedial purposes of CERCLA as well as the language of Section 9604(b) allowing recovery of *"all* of the costs incurred in a remedial or removal action." *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1503 (6th Cir.1989). *See also: United States v. South Carolina Recycling & Disposal, Inc.* ("SCRDI"), 653 F.Supp. 984 (D.S.C.), *aff'd in part, vacated in part, and remanded, United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 3156,

104 L.Ed.2d 1019 (1989); *United States v. Northeastern Pharmaceutical & Chemical Co.* ("NEPACCO"), 579 F.Supp. 823 (W.D.Mo.1984), *aff'd in part, rev'd in part, and remanded,* 810 F.2d 726 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). *But see: United States v. Ottati & Goss,* 694 F.Supp. 977 (D.N.H.1988). This Court agrees with the Sixth Circuit's finding that indirect costs should be recoverable. To bar the Government from recovering proportionate overhead expenses would be to create incentives for responsible parties to allow the Government to bear an unrecoverable portion of costs associated with cleanup. As stated by the *R.W. Meyer* court, "The fact that the government's [sic] indirect costs may be higher than another entity's does not make those costs any less recoverable, particularly in view of the defendants' failure to handle the cleanup on their own." *R.W. Meyer,* 889 F.2d at 1504. Accordingly, this Court is of the opinion the Government's proportionate indirect costs fall within the purview of recoverable costs under CERCLA.

■ As for the discrepancy between the indirect costs sought by the EPA and DOJ and the affidavit of Dale R. Jenson, a CPA hired by Sequa, this Court disagrees with the premise upon which Mr. Jenson bases his opinion. Mr. Jenson finds that the indirect costs incurred by the EPA should not exceed, on a percentage basis, the indirect costs documented by the lead governmental agency. Mr. Jenson assumed the lead Governmental agency for the Odessa Chromium I site is the TWC as the TWC documented four times the costs of the EPA. Mr. Jenson then demonstrated the TWC's indirect costs ranged from 44.03 to 53.63 per cent of its direct labor (personnel plus release) costs. This Court is not inclined to agree one agency's indirect costs should be equal, percentage-wise, to another agency's, nor does the Court find because the TWC incurred a greater number of direct costs it then became the lead agency in this action. From all the evidence before the Court, it seems clear the EPA has spearheaded the recovery of the Odessa Chromi-

um I site. In addition, or in the alternative, one agency's indirect costs has no bearing on another agency's, as the tasks performed by each are as varied as the agencies themselves. The imposition of an invariable percentage structure would unduly limit the responsive actions of the EPA and the state agencies with which they work and would not serve the broad remedial purposes of CERCLA. For this reason, the Court is of the opinion Sequa's argument indirect costs should be tied to one agency's percentage is without merit and improper under CERCLA.

### APPORTIONMENT OF LEGAL FEES

 Sequa also challenges the Government's claim for litigation expenses. This Court is of the opinion legal expenses, like indirect costs, are recoverable as part of the total cost the Government was forced to undertake due to the responsible parties' inaction regarding cleanup. Other courts found likewise. *See: SCRDI, supra; NEPACCO, supra.* Sequa then argues the Government's litigation expenses should be apportioned among the responsible parties to reflect Bell's initial bankruptcy action, which was removed to this Court, and the suit filed against the potentially responsible parties in late 1988 which was later consolidated with the bankruptcy removal. This Court agrees the litigation expenses should be so apportioned. In accordance therewith, the Government shall file an affidavit reflecting those costs incurred prior to the filing of case no. MO–88–CA–300 and those costs incurred thereafter within thirty (30) days of the date below. Costs incurred following the filing of MO–88–CA–300 shall be divided equally *among* Bell, Sequa and John Leigh.

### QUESTION OF FACT RE: COSTS

Sequa further points to the fact documented costs and claimed costs of the EPA and DOJ do not correspond. The Court is of the opinion the Government shall submit an affidavit detailing exactly those costs claimed including a breakdown of the type of cost (indirect, legal, RD, RA, state-funded, etc.) within thirty (30) days of the date below for edification of the Court and opposing counsel.

 As for the costs associated with the remaining portion of the feasibility study, this Court finds the entire amount of feasibility study costs are recoverable under CERCLA as part of the remedial action. 42 U.S.C. § 9607 (Supp.1989) ("all costs of removal or remedial action incurred by the United States Government" are recoverable). CERCLA defines "remedy" as

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

42 U.S.C. § 9601(24). Further, the NCP makes the following reference to the Remedial Investigation/Feasibility Study (RI/FS):

> An RI/FS shall, as appropriate, be undertaken by the lead agency conducting the remedial action to determine the nature and extent of the threat presented by the release and to evaluate proposed remedies. This includes sampling, monitoring, and exposure assessment, as necessary, and includes the gathering of sufficient information to determine the necessity for and proposed extent of remedial action. Part of the RI/FS may involve assessing whether the threat can be prevented or minimized by controlling the source of the contamination at or near the area where the hazardous substances were originally located (source control measures) and/or whether additional actions will be necessary because the hazardous substances have migrated from the area of or near their original location (management of migration). Planning for remedial action at these releases shall, as appropriate, also assess the need for removals. During the remedial investigation, the original scoping of the

project may be modified based on factors in § 300.68(e).

40 C.F.R. § 300.68(d). It is clear the RI/FS is consistent with the NCP and the NCP contemplates a study of the ultimate remedy to be implemented at the site.

As for the differential between the IT Corporation estimates and the IT actual costs, the Court previously opined costs incurred need not be "reasonable and necessary" so long as they are consistent with the NCP. *NEPACCO, supra,* at 851. Keeping in mind the Court's finding the alternate water supply system is consistent with the NCP, this Court is once again of the opinion Sequa and the Government shall submit a joint work sheet of those items upon which they can agree and those items in dispute regarding the IT Corporation's cost overruns and the reasons therefor within thirty (30) days of the date below. The Court shall withhold its ruling on the issue until that time.

█ Sequa also claims the indirect costs of the TWC are not properly recoverable. In light of the language of § 9607, as previously cited, and of this Court's discussion of the EPA's indirect costs, the Court is of the opinion those indirect costs proportionately attributable to time spent on the Chromium I site are properly reimbursable.

## PRE-JUDGMENT INTEREST

█ Sequa's last point is the Government failed to follow statutory prerequisites in order to recover pre-judgment interest on the response costs. Sequa argues because the Government did not make a demand for payment to the Defendants, the Government is barred from recovering pre-judgment interest. The cases cited by Sequa, *General Electric Co. v. Litton Business Systems, Inc.,* 715 F.Supp. 949, 963 (W.D.Mo.1989); *United States v. Mottolo,* 695 F.Supp. 615, 631 (D.N.H.1988), show pre-judgment interest is in fact awardable in CERCLA actions. Further, as Sequa points out, both cases involve an action wherein a demand for payment was in fact made upon the Defendant(s) by the Plaintiff. Neither Court dealt with the direct issue of whether pre-judgment interest

was awardable in cases where the Plaintiff failed to make a demand for pre-judgment interest.

Having reviewed the statutory language in light of the broad remedial purpose underlying CERCLA and SARA, this Court is not inclined to accept Sequa's reading of § 9607 as requiring a specific demand for payment before pre-judgment interest is allowed. Instead, this Court reads the statutory language as a guideline for the Court to follow in determining the date from which pre-judgment interest begins to accrue should a conflict arise, as opposed to a strict requirement which, if not followed, would result in a bar to the Government's claim of pre-judgment interest. Accordingly, this Court finds prejudgment interest shall be recoverable by the Government as of the date the cost accrued.

The operative SARA language is as follows:

The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D). Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned.

42 U.S.C. § 9607(a).

In light thereof, the Court directs the Government to supply a pre-judgment interest figure to the Court within thirty (30) days of the date below justifying the date upon which the Government claims the interest begins to accrue.

Having made the above findings,

IT IS ORDERED the Government shall recover those costs outlined in the foregoing opinion.

IT IS FURTHER ORDERED the parties shall submit the following affidavits within thirty (30) days of the date below in keeping with the directives listed above:

(1) a joint worksheet detailing specific incidences of incongruity between the scope of the work to be performed by IT Corporation for TWC and the description of work in the invoices submitted by IT Cor-

poration upon which the parties can and cannot agree;

(2) an affidavit by the Government showing those legal costs incurred prior and subsequent to the filing of case no. MO–88–CA–300;

(3) a joint work sheet showing the differences between the IT Corporation cost estimates and actual costs including the tasks performed and the reasons for the cost overruns; and

(4) the Government's pre-judgment interest figure and justification for the date upon which interest begins to run.