UNITED STATES of America, Plaintiff,

v.

AMTRECO, INC., et al., Defendants.

Civ. A. No. 90–31–VAL (WDO).

United States District Court,
M.D. Georgia,
Valdosta Division.

March 22, 1994.

Frank L. Butler, III, Heidi E. Weckwert, James A. Lofton, U.S. Dept. of Justice, Washington, DC, for plaintiff U.S.

Alan M. Wolper, Rita A. Sheffey, Charles A. Perry, Atlanta, GA, for American Tel. & Tel. and Western Elec.

J. Converse Bright, Valdosta, GA, William U. Norwood, III, Thomasville, GA, for third-party defendant Lee Engineering & Const. Co.

### ORDER

OWENS, Chief Judge.

Before the court is the United States' motion for summary judgment regarding response costs under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, et seq. ("CERCLA"). After careful consideration of the arguments of counsel, the relevant case law, and the record as a whole, the court issues the following order.

### FACTS

This case has a long and complex history in this court. On March 31, 1977, defendant James Dickerson incorporated Amtreco, Inc. ("Amtreco"), a business that treated and sold wooden fence posts. Dickerson was the president, sole shareholder, and sole director of Amtreco.

In the summer of 1977, construction of a wood treatment plant for Amtreco began. The plant was constructed upon a 5.6 acre tract of land in Homerville, Georgia, that was owned by Dickerson. Between September 1977 and March 1978, thousands of gallons of creosote, a primary chemical used in the wood treating process that is classified as a hazardous substance under 42 U.S.C. § 9601(14), were delivered to the Amtreco site.

On March 30, 1978, Dickerson conveyed the property on which the plant was constructed to Amtreco in fee simple. Amtreco has held title to the property through the time of the filing of this lawsuit.[1]

Amtreco operated the wood treatment plant until sometime in 1980, when it was forced to close due to financial hardship. In January, 1984, representatives from the Environmental Protection Division of the Georgia Department of Natural Resources ("Georgia EPD") entered the Amtreco site, and, after collecting and testing samples from the site, they notified the Environmental Protection Agency ("EPA") in May. On May 16, 1984, the EPA conducted an investigation of the Amtreco site and determined that hazardous wastes were present[2] and that they should be removed from the site.

On July 19, 1984, the EPA issued an administrative order requiring Dickerson and Amtreco to initiate a cleanup at the Amtreco site. Under the administrative order, Dickerson and Amtreco were given until July 24, 1984, to begin the cleanup, and they were to complete the cleanup within forty-two days. Dickerson and Amtreco submitted a proposal to the EPA to use biodegradation to clean the site, and the EPA extended the July deadline in order to consider the proposal.

On August 27, 1984, the EPA rejected the proposal on the ground that it was not an adequate method to remove the waste from the Amtreco site. The EPA then informed defendants that it would begin a cleanup of the site on September 5, 1984, using funds from the Hazardous Substance Response Trust Fund.

On September 4, 1987, Dickerson and Amtreco sought to block the EPA action by filing a suit in this court for injunctive and declaratory relief from the EPA's proposed cleanup. This court ultimately denied the relief and held that the EPA was entitled to enter the Amtreco site and conduct a cleanup action there. *United States v. Dickerson,* 660 F.Supp. 227 (M.D.Ga.1987). This court specifically found that the EPA had established that "there has been a release or may be a release of a hazardous substance" at the site, *Dickerson,* 660 F.Supp. at 231; therefore, the EPA had the right to conduct a response action. *Id.* The Eleventh Circuit affirmed in *Dickerson v. Administrator, En-*

---

1. For convenience, the court will refer to the property on which the Amtreco plant was located as the "Amtreco site."

2. The Amtreco site contained approximately 250 drums of creosote compounds and other hazardous substances. In addition, two lagoons and five tanks on the site contained creosote wastes. There were also PCP's and other hazardous substances in varying amounts in containers on the property.

*vironmental Protection Agency*, 834 F.2d 974 (11th Cir.1987).

On July 2, 1987, the EPA selected off-site transport as the method to remove the hazardous materials from the Amtreco site, and funding for the cleanup was authorized. The actual cleanup took place from August 10, 1987 to March 18, 1988.

On April 26, 1990, the United States filed its complaint in this court seeking from defendants the recovery of all costs connected to the cleanup.

On December 22, 1992, this court granted the United States' motion for summary judgment regarding the issue of defendants' liability for response costs under CERCLA. *United States v. Amtreco, Inc.*, 809 F.Supp. 959 (M.D.Ga.1992). In concluding, this court wrote:

> The determination of the United States' motion leaves the following issues to be determined at trial:
>
> 1. All Costs Attributable to the Cleanup of the Amtreco Site
>
> 2. Whether the Amtreco Response Action Was a Removal or Remediation
>
> 3. Those Costs Not Inconsistent With the National Contingency Plan

**3.** A "remedial" action

means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facili-

In determining which costs are not inconsistent with the national contingency plan, the following issues are among those that will be considered if defendants choose to raise them:

1. Cost Effectiveness (if required)
2. EPA Selection of the Response
3. Petroleum Exclusion

*Amtreco, Inc.*, 809 F.Supp. at 971. In response to the December 22, 1992 order, the United States filed this motion for summary judgment regarding response costs.

## DISCUSSION

In addressing the United States' motion for summary judgment on costs, this court is required to undertake a three-part inquiry. First, the court must decide whether the Amtreco response action was a "removal" or a "remediation." Second, the court must determine what costs are attributable to the cleanup of the Amtreco site. Finally, the court must determine whether any of the costs incurred by the United States are inconsistent with the National Contingency Plan ("NCP").

I. "Removal" or "Remediation"

▮ Defendants assert that the United States undertook a "remedial" action [3] at the Amtreco site, not a "removal" action [4], and,

ties where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

*Id.* § 9601(24).

**4.** A "removal" action is defined as follows:

"[R]emove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the

1582

therefore, because the United States failed to meet the NCP's requirements for a "remedial" action, defendants are not liable for the costs incurred. Defendants contend that "[r]emoval actions are only meant to remove whatever immediate threat is present so that funds can be utilized on other sites.... The action taken by the EPA was not a short term, emergency action but was in the nature of an alleged permanent long term remedy." This particular argument, however, was rejected by the Eighth Circuit Court of Appeals in *General Electric Co. v. Litton Industrial Automation Systems, Inc.*, 920 F.2d 1415, 1419 n. 4 (8th Cir.1990). The court wrote:

> [The defendant] argues that only short-term, temporary responses can be considered removals.... We hold that [the plaintiff's] response was not too time-consuming to be considered a removal, as the cleanup took little more than a year, with work performed in three segments over a span of five different months. We do not read either [*Exxon Corp. v. Hunt*, 475 U.S. 355 [106 S.Ct. 1103, 89 L.Ed.2d 364] (1986) or *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726 (8th Cir.1986) ] as establishing that an excavation that totally and permanently cleans up a hazardous site can never be classified as a removal action.

*General Electric Co.*, 920 F.2d at 1419 n. 4.

In the case *sub judice*, the actual cleanup took place from August 10, 1987 to March 18, 1988. Accordingly, the court finds that this action "was not too time-consuming to be considered a removal [action]." *Id.* In addition, both this court and the Eleventh Circuit Court of Appeals have already recognized the United States' response as a "removal" action. See *Dickerson*, 834 F.2d at 977 ("federal courts do not have subject matter jurisdiction for pre-enforcement reviews of EPA **removal** actions ..."); *Dickerson*, 660 F.Supp. at 230. Therefore, the court holds

that the United States' response is properly categorized as a "removal" action.

## II. Costs Attributable to the Cleanup

Parties held responsible for response costs under CERCLA "shall be liable for ... *all costs of removal* or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A) (emphasis added). " 'As long as the actions taken by the government were in harmony with the [national contingency plan], the costs incurred pursuant to those actions are presumed to be reasonable and therefore are recoverable.' " *United States v. Hardage*, 733 F.Supp. 1424, 1433 (W.D.Okl.1989).

What are "costs of removal"?

> "[R]emove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). Therefore, all costs incurred as a result of actions undertaken pursuant to § 9601(23) are included within the calculation of attributable removal costs. Attributable removal costs, however, are not limited solely to those actions contained in § 9601(23). For example, 42 U.S.C. § 9604(b) expands the scope of attributable removal costs beyond that contained in § 9601(23). *See United States v. Hardage*, 982 F.2d 1436, 1441 (10th Cir.1992). Section 9604(b) provides, in part:

> Whenever the President is authorized to act pursuant to subsection (a) of this sec-

---

public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacua-

tion and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act. 42 U.S.C. § 9601(23).

tion, or whenever the President has reason to believe that a release has occurred or is about to occur, or that illness, disease, or complaints thereof may be attributable to exposure to a hazardous substance, pollutant, or contaminant and that a release may have occurred or be occurring, *he may undertake such investigations, monitoring, surveys, testing, and other information gathering* as he may deem necessary or appropriate to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances, pollutants or contaminants involved, and the extent of danger to the public health or welfare or to the environment. In addition, *the President may undertake such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations* as he may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter.

42 U.S.C. § 9604(b)(1) (emphasis added). Finally, "costs of removal" also include prejudgment interest on those costs outlined above. 42 U.S.C. § 9607(a)(4).

■ Accordingly, "costs of removal" consist of:

(1) Investigative costs [5];

(2) Costs for designing and implementing a removal action [6];

(3) Enforcement, administration and litigation costs [7]; and

(4) Prejudgment interest [8].

■ In its motion for summary judgment regarding CERCLA response costs, the United States set forth sufficient evidence to establish those costs attributable to the cleanup of the Amtreco site and the category of recoverable costs into which each expenditure fell. Although defendants contest the United States' calculation of those costs, defendants have put forth nothing more than conclusory allegations attacking the means by which the United States chose to present the costs it incurred. Defendants have not asserted that the costs set forth by the government do not fall within the appropriate categories. Accordingly, the court finds that the United States incurred costs in the amount of $2,094,410.10 in the cleanup of the Amtreco site.

### III. National Contingency Plan

■ In an action brought by the United States to recover response costs, the defendant bears the burden of proving that the response costs are inconsistent with the NCP. *United States v. Northeastern Pharm. & Chem. Co.*, 810 F.2d 726, 747 (8th Cir.1986); *Hardage*, 733 F.Supp. at 1433. As this court stated in its December 22, 1992 order, "[i]n determining which costs are not inconsistent with the national contingency plan, the following issues are among those that will be considered if defendants choose to raise them:

1. Cost Effectiveness (if required)

2. EPA Selection of the Response

3. Petroleum Exclusion"

*Amtreco, Inc.*, 809 F.Supp. at 971.

### A. Cost Effectiveness

■ As discussed, "cost effectiveness" will only be considered by the court if raised by defendants and "if required." Although defendants have raised the issue of cost effectiveness, the issue is not properly before the court. "CERCLA mandates that the NCP assure cost-effectiveness *for remedial actions only.* CERCLA contains no corresponding mandate for removal actions." *Hardage*, 982 F.2d at 1443; *see also* 42

---

5. *See Hardage*, 733 F.Supp. at 1432 ("Federal courts have held that the United States is entitled to recover its investigative costs from parties liable under Section 107(a)").

6. *See United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1502–04 (6th Cir.1989); *United States v. Bell Petroleum Services, Inc.*, 734 F.Supp. 771, 782 (W.D.Tex.1990); *Hardage*, 733 F.Supp. at 1432.

7. *See R.W. Meyer, Inc.*, 889 F.2d at 1503; *Bell Petroleum Services, Inc.*, 734 F.Supp. at 783; *Hardage*, 733 F.Supp. at 1432 ("Courts have also held Section 104(b) entitles the United States to recover its litigation costs from liable parties").

8. *See R.W. Meyer, Inc.*, 889 F.2d at 1502.

U.S.C. § 9605(7). Therefore, because the court has already found that the United States' response is properly categorized as a "removal" action, the issue of cost effectiveness is not relevant to the determination of whether the "removal" costs are inconsistent with the NCP.

### B. EPA Selection of the Response

Once the government [has] established [a] prima facie case, the burden shift[s] to the [defendant] to demonstrate that the government's response action that gave rise to the particular cost submitted at summary judgment, was inconsistent with the NCP *in that the government's choice of response action was arbitrary and capricious.*

.     .     .     .     .

As long as the government's choice of response action is not inconsistent with the NCP, its costs are presumed to be reasonable and therefore recoverable.

*Hardage,* 982 F.2d at 1443.

The courts which have addressed the issue of what it means for a cost to be "not inconsistent with the NCP" ... have taken a literal approach to the "inconsistency" phrase. The courts have insisted that defendants base allegations of "inconsistency" on *specific* provisions of the NCP....

Beehler, Gold & Novick, *Contesting of CERCLA Costs by Responsible Parties— There Is No Contest,* 22 Envtl.L.Rep. 10763, 10773 (Dec.1992).

■ Defendants assert that the United States' choice of response action was inappropriate because (1) removal actions are not intended to provide long-term remedies and (2) off-site transport is not appropriate within the context of a removal action. As discussed earlier, however, the United States' response at the Amtreco site was not too

long as to prevent it from being a removal action. Further, the 1985 NCP clearly can be read as authorizing off-site transport. *See* 40 C.F.R. § 300.65(c) (1985).[9] Accordingly, defendants have failed to raise a genuine issue of material fact as to whether the response chosen by the United States was arbitrary and capricious.

### C. Petroleum Exclusion

■ 42 U.S.C. § 9601(14) states that "[t]he term [hazardous waste] does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance...." 42 U.S.C. § 9601(14). According to defendants, "[i]t [is] undisputed that 'Bunker C' at the Amtreco [site] was a Petroleum Product in the nature of fuel and that it was industry practiced [sic] to mix creosote with fuel oil.... [Therefore,] [p]laintiff can not recover for any oils, or fractions thereof which were responded to." However,

a plain reading of this "exclusionary" provision does not warrant inclusion of oil *which has become contaminated with hazardous substances through use;* rather, what does come within the ambit of the "petroleum exclusion" is the oil or oil fraction which naturally contains the hazardous substance(s) unless the fraction itself is specifically listed or designated as a hazardous substance. This interpretation ... [is consistent] with the legislative history ... which indicates that the "petroleum exclusion" is an exclusion from CERCLA for "oil spills," themselves and not for releases of oil which through use has become contaminated with (hazardous) substances not naturally found in oil.

*United States v. Alcan Aluminum Corp.,* 755 F.Supp. 531, 539 (N.D.N.Y.1991) (emphasis added). Defendants concede that any petro-

---

9. The following removal actions are, as a general rule, appropriate in the following situations; however, this list does not limit the lead agency from taking any other actions deemed necessary in response to any situation ...:

.     .     .     .     .

(6) Removal of highly contaminated soils from drainage or other areas where removal will reduce the spread of contamination.

40 C.F.R. § 300.65(c).

leum product that may have been removed by the United States was mixed with creosote. As such, the material removed from "Bunker C" did not fall within the petroleum exclusion.

### IV. Conclusion

The United States has set forth sufficient evidence to establish the response costs it incurred at the Amtreco site. The burden then shifted to defendants to establish that the costs incurred by the United States' at the Amtreco site were inconsistent with the NCP. Defendants, however, failed to meet this burden. Accordingly, the United States' motion for summary judgment regarding CERCLA response costs in the amount of $2,094,410.10 is **GRANTED.**

**SO ORDERED.**

