ENVIRONMENTAL PROTECTION AGENCY, By and Through the UNITED STATES of America Plaintiff

v.

TMG ENTERPRISES, INC., Omnisource Corp., Kentucky Association of Electric Cooperatives, Inc. Louisville Gas & Electric Co., General Electric Co., K & R Corp. d/b/a Tri–City Scrap Co., and United Electric Co., Inc. Defendants.

K & R CORP. d/b/a/ Tri–City Scrap Co. Third–Party Plaintiff

v.

John FELLONEAU, Jr. Third–Party Defendant.

TMG ENTERPRISES, INC., Omnisource Corp., Louisville Gas & Electric Co., and K & R Corp. d/b/a/ Tri–City Scrap Co. Third–Party Plaintiffs

v.

CSX TRANSPORTATION INC., Louisville Scrap Material Co., Inc., FMC Corp., Ford Motor Co. Third–Party Defendants.

John FELLONEAU, Jr. Third–Party Plaintiff

v.

Harry KLETTER Third–Party Defendant.

LOUISVILLE GAS & ELECTRIC CO. Third–Party Plaintiff

v.

BIG SANDY RURAL ELECTRIC COOPERATIVE, CORP., Blue Grass Rural Electric Cooperative, Corp., Clark Rural Electric Cooperative, Corp. Cumberland Valley Rural Electric Cooperative, Corp., Farmers Rural Electric Cooperative, Corp., Fleming–Mason Rural Electric Cooperative, Corp., Fox Creek Rural Electric Cooperative, Corp., Grayson Rural Electric Cooperative, Corp., Green River Electric Corp., Harrison Co. Rural Electric Cooperative, Corp., Henderson–Union Rural Electric Cooperative, Corp., Hickman–Fulton Co. Electric Cooperative, Corp., Inter–County Rural Electric Cooperative, Corp., Jackson Co. Rural Electric Cooperative, Corp., Jack-son Purchase Electric Cooperative, Corp., Licking Valley Rural Electric Cooperative, Corp., Meade Co. Rural Electric Cooperative, Nolin Rural Electric Cooperative, Corp., Owen Electric Cooperative, Inc., Pennyrile Rural Electric Cooperative, Corp., Salt River Electric Cooperative, Corp., Shelby River Electric Cooperative, Corp., South Kentucky Rural Electric Cooperative, Corp., Taylor Co. Rural Electric Cooperative, Corp., Warren Rural Electric Cooperative, Corp., West Kentucky Rural Electric Cooperative, Corp. Third–Party Defendants.

TMG ENTERPRISES, INC., Omnisource Corp., Louisville Gas & Electric Co., General Electric Co., and K & R Corp. d/b/a/ Tri–City Scrap Co. Third–Party Plaintiffs

v.

AT & T CORP., Boating Corp. of America, f/k/a Aluminum Cruisers, Inc., Cables Corp., f/k/a/ Cablec Corp., Fell Iron & Metal, L & S Metals & Processing, Link Electric Co., Donna Moubray, d/b/a Cash Electric, George Oakleaf, d/b/a Ace Salvage, Portland Salvage, Precision National Corp., RES Recycling, f/k/a A & E Metals, Third–Party Defendants.

Civil Action No. 94–CV–544L(M).

United States District Court,
W.D. Kentucky,
Louisville Division.

July 16, 1997.

**1114**

Richard A. Dennis, Asst. U.S. Atty., Louisville, KY, Lois J. Schiffer, James A. Loftin, U.S. Dept. of Justice, Environment and Natural Resources Div., Washington, DC, Andrew J. Harrison, Jr., Robert Caplan, U.S. E.P.A., Region IV, Atlanta, GA, for E.P.A.

Vanessa M. Berge, Wyatt, Tarrant & Combs, Frankfort, KY, Byron E. Leet, David A. Smart, Wyatt, Tarrant & Combs, Louisville, KY, for TMG Enterprises, Inc.

William Patrick Stallard, Laura D. Keller, Stites & Harbison, Louisville, KY, Judith A. Villines, Stites & Harbison, Frankfort, KY, Alan VerPlanck, Richard E. Fox, Barrett & McNahny, Ft. Wayne, IN, for Ominsource Corp.

Anne Adams Chesnut, John C. Bender, Greenebaum, Doll & McDonald, Lexington, KY, Robert J. Ehrler, Louisville Gas & Elec. Co., Angela N. Gardiner, Louisville, KY, for Louisville Gas & Elec. Co.

Mark R. Feather, Douglas W. Langdon, Brown, Todd & Heyburn, Louisville, KY, for General Elec. Co.

William R. Kenealy, Kenneth L. Sales, Segal, Isenberg, Sales, Stewart, Cutler & Tillman, Bernard S. Ritchie, Jr., Louisville, KY, for K & R Corp.

Edward H. Bartenstein, James T. Lobb, MacKenzie & Peden, Louisville, KY, for United Elec. Co., Inc.

Edward H. Stopher, Boehl, Stopher & Graves, Louisville, KY, Lawrence E. Forgy, Jr., Frost & Jacobs, Lexington, KY, Michael McGovern, McQuire, Woods, Battle & Boothe, L.L.P., Washington, DC, Eugene E. Mathews, McQuire, Woods, Battle & Boothe, L.L.P., Richmond, VA, Donald D. Anderson, McGuire, Woods, Battle & Boothe, Jacksonville, FL, for CSX Transp., Inc.

W.P. Curlin, Jr., Robert C. Moore, Hazelrigg & Cox, Frankfort, KY, for Louisville Scrap Material Co., Inc.

Dean K. Hunt, Jackson & Kelly, Lexington, KY, Stanton L. Cave, Louisville, KY, John F. Stillman, FMC Corp., Philadelphia, PA, for FMC Corp.

David E. Dearing, Cromer, Eaglesfield & Maher, Kenneth T. Roberts, Roberts & Bishop, Indianapolis, IN, Mark D. Edie, Ford Motor Co., Dearborn, MI, for Ford Motor Co.

Samuel D. Hinkle, IV, David E. Fleenor, John B. Park, Stoll, Keenon & Park, Louisville, KY, Catherine S. Stempien, AT & T Law Div., Liberty Corner, NJ, for AT & T Corp.

Steven C. Douse, King & Ballow, Nashville, TN, for Boating Corp. of America.

Sean Bezark, Jeffrey T. Kraus, Altheimer & Gray, Chicago, IL, Phillip J. Shepherd, Newberry, Hargrove & Rambecure, Frankfort, KY, for Cables Corp.

Larry J. Kane, Bingham, Summers, Welsh & Spilman, Indianapolis, IN, for Fell Iron and Metal.

M. Clark Spoden, Nashville, TN, for L & S Metals Processing.

Robert J. Bohnert, Louisville, KY, for George Oakleaf.

Nobel Y. Dowell, Jr., Mr. Vernon, IL, for Res Recycling.

## MEMORANDUM OPINION AND ORDER

McKINLEY, District Judge.

This matter is before the Court on Motion by Plaintiff, the Environmental Protection Agency [hereinafter "EPA"], for Partial Summary Judgment on the issue of liability against Defendants TMG Enterprises, Inc. [hereinafter "TMG"], K & R Corporation d/b/a/ Tri–City Scrap Company [hereinafter "K & R], Omnisource Corporation [hereinafter "Omnisource"], Louisville Gas & Electric

Company [hereinafter "LG & E"], General Electric Company [hereinafter "GE"], and United Electric Company [hereinafter "United Electric"]. [DN 92] This action was commenced by the EPA, through the United States, pursuant to Section 107(a) of the Comprehensive Environmental Response Compensation and Liability Act [hereinafter "CERCLA"], codified as amended by the Superfund Amendments and ReAuthorization Act of 1986 at 42 U.S.C. § 9607(a). The EPA seeks to recover hazardous substance cleanup costs incurred at the Carlie Middleton Metal Yard the Sonora Burn Superfund Sites located in Hardin County, Kentucky.

Also before the Court are Motions for Summary Judgment by Defendants TMG [DN 118], K & R [DN 119], Omnisource [DN 122], GE [DN 124] and United Electric [DN 128] on the recoverability of response costs.

## I. Statement of Facts

### A. The Sites

From 1973 until the late 1980s, Carlie Middleton [hereinafter "Middleton"] and his associates processed scrap metal at two sites in Hardin County, Kentucky hereinafter referred to as the Carlie Middleton site and the Sonora site.[1] Some of the "processing" Middleton performed resulted from an informal arrangement Middleton had with several scrap dealers in the Louisville area. Pursuant to this arrangement, Middleton was paid by the scrap dealers to remove the insulation or coating from insulated copper wire.[2]

Middleton's general practice was to pick up large amounts of copper wire from a dealer and transport the wire back to the Carlie Middleton or Sonora site, where the wire was dumped on the ground and burned. Burning would melt away the insulation material leaving "clean" copper wire which Middleton would return to the scrap dealer. Insulated copper wire is typically coated with material containing polyvinyl choride ("PVC") and lead.

During this period, Middleton also "processed" electrical transformers and transformer cores at the two sites. EPA alleges that some of the transformers that were burned at the two sites came from the Metal-Center facility in Louisville, Kentucky. Middleton's general practice was to pick up the transformers and transformer cores and to return the extracted copper following processing. Middleton extracted copper from the transformers and cores by unloading the cores onto the ground and setting fire to them, thereby melting and loosening any oil, paper and insulation surrounding the copper. After allowing time to cool, Middleton would separate and return the clean copper, leaving the burned transformer carcasses on the ground.

### B. The Scrap Dealers and Scrap Metal Generators

The Defendants in this action are several Louisville, Kentucky scrap dealers and the companies who generated the scrap metal allegedly sold to those dealers. At a hearing held on June 26, 1996, Defendant–Generators GE, LG & E and United Electric informed the Court that they had entered settlement negotiations with the United States. By agreement of the Parties, the Court will refrain from addressing the present Motions as they pertain to these Defendants during the pendency of these negotiations.

#### 1. K & R Corporation d/b/a Tri–City Scrap

Tri-City Scrap is the operating name of a ferrous scrap business located at 7100 Grade Lane in Louisville, Kentucky. Although owned and operated by different entities, the scrap yard has been in operation since the 1950s. K & R purchased Tri–City Scrap in 1976 and operated a ferrous and non-ferrous scrap business.[3] From 1976 until 1982, Tri–City's scrap operations were run by John Felloneau, Jr. [hereinafter "Felloneau"]. Felloneau has testified that during this peri-

---

1. The Carlie Middleton Metal Yard Site is located on a six-acre parcel near the town of Nolin, Kentucky. The Sonora Burn Site is a two acre parcel located on Silver Mine Road west of Sonora, Kentucky. Both sites are located in Hardin County in predominately agricultural areas.

2. Scrap copper wire is a common material collected by scrap dealers and resold for profit. If the copper wire is insulated or has a coating on it, dealers need to remove the covering before they can resell the copper.

3. Ferrous metals contain iron; non-ferrous metals do not.

od only Middleton performed copper wire insulation removal for Tri–City Scrap.

K & R Corporation, which owned Tri–City Scrap, went into Chapter 11 bankruptcy in 1982 and essentially shut down for a period of time. During this time, K & R sold its non-ferrous scrap business to the company that eventually became Omnisource. K & R emerged from bankruptcy in 1984 following court approval of its reorganization plan. Tri–City Scrap resumed operations at this time, but limited its business to ferrous scrap. Tri–City Scrap is currently managed and operated by Industrial Services of America. K & R continues to own the ferrous scrap yard located at 7100 Grade Lane.

## 2. Omnisource Corporation

As previously mentioned, K & R sold its non-ferrous scrap business in 1982 after it filed a petition for bankruptcy under Chapter 11 of the Bankruptcy Code. After the sale, John Felloneau continued to manage the non-ferrous business under the name of MetalCenter, Inc. [hereinafter "MetalCenter"]. Initially, MetalCenter was a wholly-owned subsidiary of Superior Companies, Inc.; eventually, following a series of mergers and name changes, MetalCenter was purchased by Omnisource.[4]

MetalCenter operated the non-ferrous scrap metal business from 1982 until June, 1986. Felloneau has testified that during this time MetalCenter purchased scrap leaded cable from LG & E, and scrap insulated copper wire from LG & E, GE and United Electric. Felloneau also has testified that during this same period MetalCenter contracted or arranged with Middleton and his helpers to clean and remove insulation from copper wire and leaded cable. It is undisputed that Middleton was the only processor of insulated copper wire for MetalCenter/Omnisource.

## 3. TMG Enterprises, Inc.

TMG was incorporated in 1985 for the purpose of acquiring the assets of MetalCenter, Inc. From June 1986, TMG has run the MetalCenter facility.[5] It is undisputed that on at least one occasion TMG contracted with Middleton to remove the insulation from insulated copper wire. According to Kenny Middleton, the insulated copper wire that was cleaned for TMG was burned at the Carlie Middleton Site.

## 4. Louisville Gas & Electric Company

LG & E is a utility which provides gas and electric service to Louisville and the surrounding counties. As a provider of electrical services, LG & E utilizes both insulated and non-insulated wire and cable to transmit and distribute electricity to the public. In the course of maintaining and repairing its transmission and distribution service lines, LG & E removes wire and cable from the system and sells it to local metal purchasers for recycling. Although it is disputed whether LG & E sold copper wire and leaded cable to Tri–City Scrap between 1975 and 1982, it is undisputed that LG & E sold insulated wire to MetalCenter/Omnisource between October 1983 and November 1985.

## 5. General Electric

GE has two facilities in Louisville: the Apparatus Service Center, which is a repair facility for industrial electrical and mechanical equipment, and the Appliance Park, which is an appliance manufacturing facility. The United States alleges that the Apparatus Service Center sold scrap copper motor windings[6] to Tri–City Scrap from 1976 to June 1982. The government also alleges that the Appliance Park sold insulated copper wire to Tri–City Scrap during this same period. Although GE disputes whether it did any business with Tri–City Scrap from 1976 through June 1982, GE admits that between

---

**4.** Omnisource succeeded to all of the liabilities of MetalCenter, Inc. in existence as of September 30, 1988.

**5.** In 1985, Felloneau and Mark Trakhtenberg, another MetalCenter manager, formed a partnership, Fetra Investments. Fetra purchased the real estate, improvements and a portion of the equipment at the MetalCenter facility from the

owner of Omnisource. TMG is the operating company that has run the scrap business since June, 1986.

**6.** The Apparatus Service Center would rebuild and rewind electric motors. Some of the copper wire left over from the rewinding and refurbishing process was insulated.

December 1982 and May 1983 it sent scrap copper wire to MetalCenter for processing.

### 6. United Electric Company, Inc.

United Electric is an electrical contractor that does business in the Louisville area. It is undisputed that United Electric sold insulated copper wire to MetalCenter on four occasions during 1983 and 1985. However, United Electric does dispute whether its wire was processed by Middleton.

### C. Clean-Up Activities at the Sites

In February 1986, the Kentucky Department for Environmental Protection [hereinafter "KDEP"] initiated investigation of the Carlie Middleton and Sonora sites. Based on the results of this investigation, KDEP provided the EPA with a Preliminary Assessment Report recommending a low priority clean-up of both sites. Although lead and PCBs were present in soil samples, the sites lacked "the volume of waste, source of contaminant transport, and a large population potentially affected to warrant an immediate site inspection."

In March 1988, however, KDEP sent EPA two Site Screening Investigation Reports regarding the Carlie Middleton and Sonora sites. The reports listed concentrations of lead in soil and ash samples taken from the sites that were nearly four times that listed in the 1986 reports. In an accompanying letter, KDEP noted that the sites were located in a highly karst region [7] and that an estimated 669 residents within a three mile radius utilized the groundwater for drinking purposes. KDEP recommended that "the responsible parties or the EPA conduct a removal action on contaminated soils."

In September 1988, the EPA issued Administrative Orders to Middleton and his associates to clean up the two sites. After Middleton and others failed to take steps necessary to clean up the sites, EPA contractors also conducted testing at the sites. Their analysis confirmed the presence of lead, PCBs, barium and copper. In April 1989, the EPA generated an Action Memo-

randum for each site requesting authority to perform a removal action. After receiving authority to proceed, the EPA began cleanup operations in August 1989 and excavated approximately 5000 cubic yards of contaminated soil from the two sites. Along with some 655 transformers and other electrical carcasses, the contaminated soil at each site was placed on impermeable liners and covered. After conducting post-excavation sampling and the first phase of a hydrogeological investigation, the EPA and its contractors demobilized from the sites in late September 1989.

On October 5, 1990, the EPA obtained an exemption from the 12–month statutory limit on removal actions. The results of a treatability study completed in January 1991 indicated that the stockpiled soil could be effectively neutralized by solidification with portland cement. In July 1991, the EPA generated another Action Memorandum requesting a cost ceiling increase in order to continue the removal action at the Carlie Middleton site. The Action Memorandum also documented EPA's recommendation for treating the contaminated soil stockpiled at the two sites. The EPA concluded that the most cost-effective method of treatment included transporting the soil and ash from the Carlie Middleton site to the Sonora site before treatment.[8] The EPA then recommended treating the soil by mixing one part contaminated soil with three parts portland cement. Finally, the EPA recommended transporting the treated soil to an off-site landfill for permanent disposal because certain site specific factors at both the Sonora and Carlie Middleton sites prohibited on-site disposal.

On September 2, 1994, the EPA filed the present action seeking to recover its response costs incurred at the two sites. As of September 30, 1995, total removal costs were $985,949.77 for the Sonora site and $935,452.21 for the Carlie Middleton site.

---

7. A karst landscape is characterized by rolling plains with prolific depressions known as sinkholes. The prominence of the karstic features at the sites makes groundwater extremely susceptible to contamination.

8. The EPA's Action Memorandum noted that the Carlie Middleton site had too many trees and was not large enough to contain the equipment necessary to process the contaminated soil. Furthermore, the EPA felt that it was more cost effective to mobilize the equipment needed to finish the project only one time rather than two.

## II. STANDARD OF REVIEW

The EPA has moved for partial summary judgment against the named defendants on the issue of liability only. The EPA argues that there are no material fact issues and that defendants are liable under CERCLA for EPA's response actions at the Carlie Middleton and Sonora sites.[9]

In order to grant a motion for summary judgment, the court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

Although the court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The Rule requires the nonmoving party to present "*specific facts* showing there is a *genuine* issue for trial. Fed.R.Civ.P. 56(e) (emphasis added). Moreover, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

## III. LIABILITY

### A. Elements of Liability

CERCLA was enacted in 1980 as a means for cleaning up hazardous waste sites and spills. *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1040 (2d Cir.1985). It was intended "primarily to facilitate the prompt cleanup of hazardous waste sites by placing the ultimate financial responsibility for cleanup on those responsible for hazardous wastes." *Walls v. Waste Resource Corp.*, 823 F.2d 977, 981 (6th Cir.1987). To establish liability under CERCLA § 107, the United States must establish that:

(1) there has been a "release" or a "threatened release" of a "hazardous substance" from the site;

(2) the site is a "facility";

(3) the release or threatened release has caused the United States to incur response costs; and

(4) the defendant falls within one or more of the categories of responsible parties set forth in CERCLA Section 107(a)(1)-(4). 42 U.S.C. § 9607(a)(1)-(4).

*Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989); *United States v. Aceto Agric. Chemicals Corp.*, 872 F.2d 1373, 1379 (8th Cir.1989).

Under § 9607(a), CERCLA imposes a form of strict liability on responsible parties. *J.V. Peters & Co., Inc. v. EPA*, 767 F.2d 263, 266 (6th Cir.1985). Once each element of the above test has been established, plaintiff is entitled to summary judgment on the issue of liability. *Amoco Oil*, 889 F.2d at 668. This is true even where a genuine issue exists as to the appropriate damages. *Id.* In effect, a bifurcated determination is made. *Id.* Where the plaintiff seeking summary judgment establishes liability as a matter of law, the action then proceeds on the issue of damages. *Id.*

---

9. After filing this Motion, the EPA conceded that there are factual issues regarding whether TMG and K & R are responsible parties with respect to the Sonora Site. However, in a Supplemental Memorandum In Support of Its Motion For Summary Judgment Against K & R Corporation d/b/a Tri–City Scrap Company filed June 27, 1996, the EPA presented new evidence which it claims is sufficient to prove that scrap materials from K & R d/b/a/ Tri–City Scrap were burned at the Sonora site.

## B. Release or Threatened Release of a Hazardous Substance

The material facts are not in dispute with respect to whether a release of a hazardous substance occurred at the Carlie Middleton and Sonora Sites. Defendants K & R, Omnisource and TMG do not dispute that insulation was removed from copper wiring at the sites by burning the wire directly on the soil. Defendants do not dispute that at least some of this insulation contained lead. Defendants do not dispute that electrical transformers and motor windings were burned directly on ground at both sites, nor do they dispute that at least some of this material contained PCBs. Moreover, there is no dispute that burning of these materials caused *some* amount of lead and PCBs to liquefy, melt or otherwise accumulate in soil at both sites.

■ However, Defendants argue that the presence of "hazardous substances" at both sites is irrelevant because the United States clearly intended to limit its response to removal of "hazardous waste" as defined by the Solid Waste Disposal Act (amended by the Resource Conservation and Recovery Conservation and Recovery Act of 1976 [hereinafter "RCRA"], 42 U.S.C. § 6903 *et seq*). In support of their argument, Defendants point to a single reference in the EPA's proposed action plan for each site which appears to limit agency response to the "excavation and disposal of all hazardous *wastes* at the site." [Emphasis added]

Under RCRA, minimum levels of contaminants must be evident in solid waste before it can be classified as "hazardous waste." Defendants argue that none of the samples found at the Carlie Middleton site and only two of the soil samples at the Sonora site indicated levels of lead, barium or PCBs sufficient to classify the soil as a "hazardous waste." Furthermore, Defendants maintain that the minimal test results obtained at the Sonora site required further testing before the EPA could make a reasoned decision to treat the soil as a hazardous waste. Therefore, Defendants argue, since "hazardous waste" was the type of "hazardous substance" at issue in this action, no release occurred sufficient for liability to attach.

The Court finds this argument patently flawed. 42 U.S.C. § 9607(a) clearly provides for liability under CERCLA when there is a "release" of a "hazardous *substance*." [Emphasis added] 42 U.S.C. § 9601(14) defines "hazardous substance" as:

(A) any substance designated pursuant to § 1321(b)(2)(A) of Title 33,

(B) any element, compound, mixture, solution, or substance designated pursuant to § 9602 of this title,

(C) any hazardous waste having the characteristics identified under or listed pursuant to § 3001 of the [Solid Waste Disposal Act] [10],

(D) any toxic pollutant listed under § 1317(a) of Title 33,

(E) any hazardous pollutant listed under § 112 of the Clear air Act [42 U.S.C. § 7412], and

(F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to § 2606 of Title 15.

Furthermore, 42 U.S.C. § 9601(22) defines "release," in pertinent part, as "*any* spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." [Emphasis added.] Courts considering the issue have confirmed the plain meaning of the statutory language by determining that there is *no minimum quantity requirement* necessary to establish the "release or threat of a release" of a hazardous substance. *Stewman v. Mid–South Wood Prod. of Mena, Inc.,* 993 F.2d 646, 649 (8th Cir.1993); *United States v. Western Processing Co. Inc.,* 734 F.Supp. 930, 936 (W.D.Wash.1990).

Thus, Subsection (C) of 42 U.S.C. § 9601(14) does indicate that "hazardous waste" under RCRA is one type of "hazardous substance" as defined under CERCLA. However, 42 U.S.C. § 9602, which is referred to in subsection (B) above, provides that the Administrator of the EPA shall promulgate

---

**10.** As amended by the Resource Conservation and Recovery Act of 1976 [hereinafter "RCRA"],

42 U.S.C. §§ 6903 *et seq.*

regulations "as may be appropriate," which designate as hazardous substances "such elements, compounds, mixtures, solutions, and substances which, when released into the environment, may present substantial danger to the public health or welfare or the environment." Therefore, the term "hazardous substance" under CERCLA also includes those substances listed in EPA regulations promulgated under CERCLA.

In the present case, it is uncontroverted that lead, barium and PCBs were present in soil and ash samples taken from the Carlie Middleton and Sonora sites. It is uncontroverted that these same substances are found in the material used to insulate copper wire, cable and/or transformers. Furthermore, each of these substances is listed as a "hazardous substance" in CERCLA regulations. *See* 40 C.F.R. § 302, Table 302.4. Thus, CERCLA liability does not depend on establishing some minimum threshold level of these substances in soil and ash samples at the two sites.

Based on the foregoing, the Court finds as a matter of law that there was a release of hazardous substances at both the Carlie Middleton and Sonora sites. Simply because an EPA action memorandum makes a single reference to "hazardous waste" rather than "hazardous substance" does not thereby limit the definition of "hazardous substance" for purposes of this CERCLA action. To hold otherwise would contravene the broad remedial purpose behind CERCLA. *City Management Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244, 251 (6th Cir.1994).

### C. Facilities

Defendants do not dispute that the Carlie Middleton and Sonora sites are "facilities" as defined by CERCLA. 42 U.S.C. § 9601(9) broadly defines "facility" to mean:

(A) any building, structure, installation equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or

(B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

The two Hardin County sites clearly fall within this definition as "[sites or areas] where a hazardous substance has been deposited, stored, disposed of or placed."

### D. Response Costs

Section 9607(a) also requires that Plaintiff show it has incurred *some* response costs as a result of the release or threatened release of a hazardous substance at a facility. *Weyerhaeuser Corp. v. Koppers Co., Inc.*, 771 F.Supp. 1406, 1413 (D.Md.1991) ("[s]o long as [plaintiff] has demonstrated that some of its costs are recoverable under CERCLA, it is entitled to judgment on the issue of liability"). CERCLA defines response to mean "remove, removal, remedy, and remedial action; all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C. § 9601(25). Thus, courts have held response costs to include *all* administrative costs, investigative costs, litigation costs and attorney fees associated with the cleanup itself and with the United States' cost recovery action. *See e.g., United States v. Northernaire Plating Co.*, 685 F.Supp. 1410 (W.D.Mich.1988), *aff'd sub nom., United States v. R.W. Meyer*, 889 F.2d 1497, 1503 (6th Cir.1989), *cert. denied*, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990).

In the present case, the EPA asserts that it has incurred $2,159,301.59 in direct and indirect response costs through September 30, 1995 at the Carlie Middleton and Sonora sites. In addition to EPA costs, the U.S. Department of Justice has incurred costs relating to this case. Although these costs have not been calculated to date, they are also recoverable under CERCLA's broad remedial provisions.

■ Defendant's do not dispute the EPA incurred response costs at the two sites; however, Defendants claim that these costs are not recoverable because the EPA's actions were inconsistent with the National Contingency Plan [hereinafter "NCP"].[11] De-

---

11. The NCP, which is set out in full at 40 C.F.R. Part 300, *et seq.*, consists of procedural and sub-

fendant's argue that this inconsistency prevents the EPA from establishing a necessary element of § 9607(a) liability.

Although § 9607(a) of CERCLA imposes a form of strict liability on responsible parties for "all costs of removal or remedial action," the government's right to recover is limited by the requirement that costs be "not inconsistent with the national contingency plan." 42 U.S.C. § 9605(7); *United States v. Hardage,* 982 F.2d 1436, 1441 (10th Cir.1992) ("if the government's response actions are in harmony with the NCP, the costs incurred by those actions are recoverable from responsible parties"), *cert. denied,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993).

By far the majority of courts, however, have found that "[a] defense that the government's response costs are incurred pursuant to response actions that are inconsistent with the NCP is a defense to *the recoverability of particular response costs, not a defense to liability for those costs.*" *Hardage,* 982 F.2d at 1445 [emphasis added]; *see also Amoco Oil v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989) (any inconsistency between the EPA's actions and the NCP should necessarily be determined in the damages phase of the litigation); *O'Neil v. Picillo,* 682 F.Supp. 706, 729 (D.R.I.1988) ("variance from the NCP does not provide a complete defense from liability" since 9607(a) bars inconsistent "costs," not "causes of action"), *aff'd,* 883 F.2d 176 (1st Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *United States v. Medley,* 17 Envtl. L.Rep. 20297, 20297 (D.S.C.1986) ("The Court further holds that consistency or inconsistency with the [NCP] is not an element of whether the government has incurred response costs for the purposes of a motion for summary judgment [on liability]. Consistency with the NCP relates only to the recoverability of various cost items, which the court holds is to be addressed during later proceedings.") Therefore, while inconsistency with the NCP is not a defense to CERCLA

liability, it may serve to limit the amount of damages for which defendants may be liable. *United States v. Kramer,* 757 F.Supp. 397, 436 (D.N.J.1991); *United States v. Mottolo,* 695 F.Supp. 615, 630 (D.N.H.1988); *see also Hardage,* 982 F.2d at 1445 (holding that a defendant who is declared liable for response costs may still challenge those costs as unrecoverable because the underlying response actions giving rise to the costs are inconsistent with the NCP).

Accordingly, the Court rejects Defendants argument. Inconsistency with the NCP is a defense only to the recoverability of particular response costs and not a defense to liability.[12] As a matter of law, any alleged inconsistency with CERCLA cannot affect the otherwise undisputed finding that response costs were incurred by the EPA in this action.

### E. Responsible Persons

To establish liability under CERCLA, the United States must prove that each of the Defendants is a "responsible person." The specific statutory language of 42 U.S.C. § 9607(a) defines "responsible persons" to include

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to

---

stantive guidelines issued by the EPA governing CERCLA cleanup actions. *See* 42 U.S.C. § 9605 (NCP shall establish "procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants"); *State v. Idarado Mining Co.,* 916 F.2d 1486, 1488–89 (10th Cir.1990).

**12.** The Court will deal separately with Defendants TMG, K & R and Omnisource's Motions for Summary Judgment on the issue of recoverability of response costs.

disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance ... alleges that each of the Defendants is a responsible party under CERCLA because each Defendant "arranged for disposal or treatment ... of hazardous substances."

The United States must also establish a causal nexus between the release of a hazardous substance and a particular generator. *United States v. Distler*, 803 F.Supp. 46, 50 (W.D.Ky.1992).

### 1. *Arrangement for Disposal*

Omnisource does not dispute that it arranged for disposal of hazardous substances at both the Carlie Middleton and Sonora sites. Likewise, K & R and TMG do not dispute that they arranged for disposal of hazardous substances at the Carlie Middleton site. However, K & R and TMG argue that the United States has failed to present any evidence that their materials were ever processed at the Sonora site.

In its Reply to Defendants' Responses, the United States withdrew its Motion relevant to K & R and TMG's liability for clean-up activities at Sonora, acknowledging a genuine factual issue existed whether K & R and TMG every processed material at that site. However, in a Supplemental Memorandum [DN 217], the United States renewed its Motion for Partial Summary Judgment against K & R, producing documents discovered subsequent to the filing of its Reply which establish that K & R did, in fact, process material at the Sonora site.

■ In response, K & R does not dispute that it sold insulated copper wire to Omnisource/MetalCenter in September 1983, November 1983, January 1984, July 1984 and December 1984. Instead, K & R claims that it is not a responsible party under CERCLA because it did not "arrange for disposal" of a hazardous substance. In this regard, K & R

reminds the Court that it had essentially ceased doing business by this time because it was in bankruptcy. K & R claims it did not intend to affect an "arrangement for disposal"; rather, its intention was merely to liquidate its assets by selling its remaining "inventory."

As defined in RCRA and incorporated by reference in CERCLA, disposal includes the "discharge, deposit, injection, dumping, spilling, leaking or placing" of any "hazardous waste" [13] ... so that "[it] may enter the environment or be emitted into the air or discharged into any waters, including ground waters." *See* 42 U.S.C. § 6903(3) (incorporated at 42 U.S.C. 9601(29)). The Sixth Circuit has noted that "disposal" takes place at the point where there is a *threat* that hazardous substances will be emitted. *AM Int'l. Inc. v. International Forging Equip. Corp.*, 982 F.2d 989, 998 (6th Cir.1993). The term "treatment" is also defined in RCRA and incorporated by reference in CERCLA to mean "any method, technique, or process, including neutralization," designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amendable for storage, or reduced in volume. *See* 42 U.S.C. § 6903(34) (incorporated at 42 U.S.C. § 9601(29)).

Although the phrase "arranged for" is not defined in the statute and CERCLA's legislative history sheds scant light on its intended meaning, courts have concluded that a liberal judicial interpretation is consistent with CERCLA's "overwhelmingly remedial" statutory scheme. *United States v. Aceto Agric. Chemicals Corp.*, 872 F.2d 1373, 1379–80 (8th Cir.1989). Furthermore, courts consistently have construed this phrase so as to promote CERCLA's dual goals: to allow the government to respond promptly and effectively to problems resulting from hazardous waste

---

**13.** Under RCRA, "hazardous waste" includes the concept of "solid waste." *See* 42 U.S.C. § 6903(5). "Solid waste" is defined as "any garbage, refuse, sludge ... *and other discarded material.*" 42 U.S.C. § 6903(27). Courts have found this definition useful in determining if a particular use made of a hazardous substance

constitutes a "disposal." *Catellus Dev. Corp. v. United States*, 34 F.3d 748, 750 (9th Cir.1994). In the present case, the insulated wire was sold for its scrap metal value. The lead-containing insulation was removed and discarded in the process of reclaiming the copper. Under *Catellus*, this constitutes a disposal.

disposal and to allow recovery of clean-up costs from those responsible for creating the problem. *Id.*

In general, courts agree that whether a defendant has "arranged for disposal" depends upon the particular facts of the case. *Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1317 (11th Cir.1990). Although courts have taken several approaches when considering this issue, the Sixth Circuit has adopted the "useful product" test which protects potentially responsible parties who were engaged in the sale of a useful product as opposed to the disposal of waste. *AM Int'l Inc.,* 982 F.2d at 999. "Liability only attaches to parties that have 'taken an affirmative act to dispose of a hazardous substance … as opposed to convey a useful substance for a useful purpose.'" *Id.* (citing *Prudential Ins. Co. v. U.S. Gypsum,* 711 F.Supp. 1244, 1253 (D.N.J.1989)). In the absence of a contract or agreement, the court must look to the totality of the circumstances, including any "affirmative acts to dispose" to determine whether a transaction involved an arrangement for disposal. *United States v. Cello–Foil Prod., Inc.,* 100 F.3d 1227, 1232 (6th Cir.1996).

> When a party sells a product incidentally containing a hazardous substance, but having value as being useful for the purpose for which it was manufactured, then the transaction is less likely to be an 'arrangement' to dispose of a hazardous substance. In these cases, the party receiving the product will use the product in the manner for which it was manufactured. On the other hand, if a product has no value for the purpose for which it was manufactured and it contains a hazardous substance, then it is more likely the sale is an 'arrangement' to dispose of the substance.

*Chatham Steel Corp. v. Brown,* 858 F.Supp. 1130, 1140 (N.D.Fla.1994).

Furthermore, in considering whether a defendant has sold a useful product, "courts have not hesitated to look beyond defendant's characterizations to determine whether a transaction in fact involves an arrangement for the disposal of a hazardous substance." *Aceto,* 872 F.2d at 1381. It is the nature of the transaction, not the parties' characterization that determines whether the transaction was a sale of a useful product or an arrangement for disposal. *United States v. Maryland Sand, Gravel & Stone Co.,* 39 Env't Rep. Cas. 1761 (D.Md.1994).

Notably, the Sixth Circuit has found that intent is important to determining "arranger" liability, but only as it relates to determination of whether the transaction involved the sale of a useful product *for its original intended purpose* or an arrangement for disposal. *See Cello–Foil,* 100 F.3d at 1232 n. 1; *see also AM Int'l,* 982 F.2d at 999.

In *AM Int'l,* for example, the defendant sold a manufacturing facility. *Id.* at 991. The facility was sold "as is" and contained equipment the purchaser could use to begin immediate business operations. *Id.* Some of the equipment contained chemicals that subsequently deteriorated and leaked into the ground. *Id.* at 992. The court found the defendant was not a responsible party under CERCLA because the defendant believed that the buyer wanted the equipment in conjunction with the operation of the business. *Id.* at 999.

> In concluding that the transaction in *AM Int'l* was not a disposal, this court relied on two findings of the district court. First, the court relied on the finding that " 'both [the buyer] and AMI intended that the chemicals would be used for the purposes for which they had been bought—the continued operation of the electroplating, heat-treating, and other processes.'" … Second, the court found that "the chemicals 'were useful and had value.'" … In sum, the district court determined that "the chemicals were not left at the facility with disposal in mind."

*Cello-Foil,* 100 F.3d at 1232 n. 1 (quoting *AM Int'l,* 982 F.2d at 999) [Internal citations omitted.]

Applying the "useful product" test, the Court rejects K & R's argument that its transaction with Omnisource was not an "arrangement for disposal." K & R's business included reclaiming copper from material which no longer was useful for its original intended purpose. When K & R shut down its operations, it no longer had any use for the scrap wire that remained on its premises. K & R could have chosen to dispose of its remaining scrap in a nonhazardous manner. However, K & R chose to sell its remaining

"inventory" to another scrap metal dealer, thereby creating a threat that hazardous substances contained in the insulation would be released into the environment during the reclamation process. Although the copper retained some residual value, the insulation material did not. Reclamation of the copper *necessitated* removal and disposal of the insulation material covering the copper wire. In the process of disposing of the insulation, a hazardous substance ultimately was released into the environment.

K & R also argues that it is not a responsible party under the "crucial decision test" adopted by some courts. K & R insists that Omnisource, not it, made the "crucial decision" to hire Middleton to remove the insulation in a manner that would result in the release of a hazardous substance. K & R argues that at the time it sold its remaining inventory to MetalCenter/Ommisource there was no "threat" that hazardous substances would be released because insulated wire is innocuous in itself. A "threat" resulted only at the time MetalCenter/Omnisource made the crucial decision to hire Middleton.

In *United States v. A & F Materials Co. Inc.*, 582 F.Supp. 842 (S.D.Ill.1984), the Court considered whether McDonnell Douglas Corporation ["McDonnell Douglas"] was a responsible party under CERCLA. In the course of its production of aircraft, McDonnell Douglas produced a caustic solution which it sold to the highest bidder, A & F Materials Company ["A & F"]. *Id.* at 844. A & F used the caustic solution to neutralize acidic oil produced as part of its oil reclamation process. *Id.* A & F then disposed of the material on its property. *Id.* at 843.

In considering McDonnell Douglas' motion for summary judgment, the Court focused on whether McDonnell Douglas had "arranged for disposal" of a hazardous material. *Id.* Although the court declined to grant McDonnell Douglas' motion, it declared that "liability for releases ... is not endless; it ends with that party who both owned and made the crucial decision how it would be disposed of or treated and by whom." *Id.* at 845.

Under the present circumstances, the Court declines to apply the crucial decision test so as to reward K & R for its alleged lack of knowledge concerning the particulars of the disposal process. Admittedly, K & R may not have known precisely when, where and how the copper wire would be treated to remove the insulation. However, K & R made the crucial decision to sell insulated copper wire to MetalCenter/Omnisource for disposal and treatment. *See Chatham Steel Corp. v. Brown*, 858 F.Supp. 1130, 1143 (N.D.Fla.1994) (holding that the crucial decision was made when spent batteries were sold to a company for recycling). Moreover, although *knowledge* of the disposal process is not a prerequisite for liability, the fact that K & R was familiar with how the insulation might ultimately be removed and disposed of and that K & R facilitated the disposal weakens its argument that it should be absolved from liability under the crucial decision test.[14]

Finally, finding that K & R did not "arrange for disposal" would enable K & R to avoid liability merely because the material it sold could accurately be labeled "inventory" in addition to being "scrap." The Court is unwilling to allow liability to hinge on a largely specious distinction, particularly where it would enable K & R to circumvent the broad remedial goals underlying CERCLA.[15]

14. John Felloneau, former general manager of K & R, was general manager of MetalCenter/Omnisource at the time K & R sold its remaining inventory. It is uncontroverted that Felloneau hired Middleton to process insulated copper wire during his employment at K & R and then while he was employed at MetalCenter/Omnisource.

15. Other courts have either rejected the "crucial decision" test as inconsistent with Congress' broad environmental objectives or skirted the appropriateness of the test by holding it inapplicable to the cases before them. *See Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1318 (11th Cir.1990) (declining to create a per se rule for manufacturer liability and concluding that a manufacturer may be liable even though it "does not make the critical decisions as to how, when, and by whom a hazardous substance may be disposed"); *Aceto*, 872 F.2d at 1381 ("Courts have also held defendants 'arranged for' disposal of hazardous wastes at a particular site even when defendants did not know the substances would be deposited at the site or in fact believed they would be deposited elsewhere."); *United States v. Ward*, 618 F.Supp. 884 (E.D.N.C.1985) (holding that CERCLA does not require that the defendant be aware of how and where materials are disposed); *United States v. Wade*, 577 F.Supp. 1326, 1333 n. 3 (E.D.Pa.

### 2. Causal Nexus

#### a. K & R

K & R also disputes whether the materials it sold to the MetalCenter/Omnisource dealers actually contributed to the contamination at the Sonora site. To establish K & R's liability, the United States must only establish a "minimal causal nexus between Defendants' hazardous waste and the harm caused by the release at a particular disposal site." *United States v. Distler*, 803 F.Supp. 46, 50 (W.D.Ky.1992). Under CERCLA, common law rules of causation, such as proximate cause, do not apply. *Id.* Plaintiff is only required to show, by a preponderance of the evidence, that the generator's waste actually reached the site in question. *Id.* However, "it is not sufficient to merely show that waste was placed into the hands of a suspect hauler." *Id.* at 51. The "causal nexus" requirement necessitates showing that the defendant's hazardous waste was deposited at the site and that the hazardous substance found in defendant's waste was also found at the site. *Id.* There is no need to connect the contamination at the site to a particular generator. *Id.*

Significantly, the *Distler* court applied this same standard where waste from several generators was commingled or became otherwise unidentifiable before being moved from one site to another. *Id.* (citing *United States v. Bliss*, 667 F.Supp. 1298 (E.D.Mo.1987)).

Thus, if random unidentifiable waste is removed from Site A to Site B, each generator with waste at Site A is potentially liable for response costs at Site B. In such a situation, each generator bears the burden of producing evidence to exculpate itself. In this way, responsibility for adequate disposal is placed squarely with the generators and they bear the risk that the waste will become unidentifiable. This notion of liability is broad, but comports entirely with the statutory purpose.

*Distler*, 803 F.Supp. at 51.

Initially, then, plaintiff must produce evidence, in the form of documents, direct testimony or circumstantial evidence, sufficient to prove that Defendant's waste

1983) (holding that a generator need not select

reached a particular site. *Id.* "Where unidentifiable waste is then moved from one site to another, there is a *rebuttable presumption* that a generator's waste was included in the shipment." *Id.* Thus, each generator bears the burden of producing evidence to exculpate itself.

In the present case, Plaintiff has produced documentary evidence showing that at least some "inventory" sold by K & R to MetalCenter/Omnisource was insulated copper wire. In addition, Felloneau maintains that at least some of this material was "processed" by Middleton after being commingled. The same hazardous substances found in the insulated wire were also found at the Sonora site. This is sufficient for the United States to establish the minimal causal nexus required by CERCLA § 107.

Under these circumstances, the burden then shifts to K & R to *disprove* causation. To survive summary judgment, a defendant "must come forward with sufficient evidence from which a jury could find that the defendant was *not* the source of the contamination." *Westfarm Assoc. Ltd. Partnership v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 681 (4th Cir.1995) (Emphasis in original), *cert. denied*, — U.S. ——, 116 S.Ct. 1318, 134 L.Ed.2d 471 (1996).

The Court is unconvinced that K & R has presented sufficient evidence for a reasonable jury to conclude that its materials did not contribute to contamination at the Sonora site. First, the United States has met its burden under *Distler*. K & R sold its remaining inventory to MetalCenter/Omnisource. This "inventory," which included insulated copper wire, was commingled with other insulated wire at the MetalCenter facility. Omnisource General Manager John Felloneau has testified that some of this material was processed by Middleton. Other testimony establishes that Middleton was processing materials at the Sonora site during this period. Finally, the same hazardous substances contained in the insulated wire were also found at the Sonora site.

Since the United States has met its burden under *Distler*, K & R must present affirma-

the site for disposal to be a responsible party).

tive evidence to disprove that its materials contributed to the contamination at the Sonora site. K & R essentially argues that there is a material dispute whether the evidence *proves* its materials were ever processed by Middleton. However, as noted in *Westfarm Assoc.*, 66 F.3d at 682, "because the burden lay on [the defendant] to *disprove* that it was a source of [the contamination], the fact that the evidence on summary judgment produced a genuine dispute as to whether the evidence *proved* [the defendant] to be a source [of the contamination] was not material, and could not serve as a basis to deny summary judgment." (Emphasis in original) Therefore, mere speculation by K & R that its material *may* not have reached the sites because it *could* have been mechanically processed or chopped is insufficient to withstand a motion for summary judgment.

#### b. TMG

■ As previously mentioned, the United States also withdrew its Motion for Partial Summary Judgment with respect to TMG's liability for response costs at the Sonora site. The United States admitted that material issues of fact exist whether TMG's materials were ever processed at Sonora. TMG, however, maintains that the Court should grant its Cross–Motion for Summary Judgment regarding its liability for clean-up costs at Sonora alleging that the United States has failed to present sufficient evidence in this regard. Viewing the evidence in a light most favorable to the United States, the Court agrees that the United States has failed to come forth with sufficient affirmative evidence for a reasonable jury to conclude that TMG's materials were ever processed at Sonora.

The parties do not dispute that on one occasion TMG arranged with Middleton to process insulated copper wire and that this wire was processed at the Carlie Middleton site. However, there is no documentary or testimonial evidence showing that TMG made any additional arrangements with Middleton to process material. The United States'

proof on this matter consists entirely of the conclusory allegation that "[s]ince TMG was the only entity that operated the MetalCenter facility after 1986, the copper wire burning at the Sonora Site must have been for TMG." This allegation, in itself, is simply insufficient to establish by a preponderance that TMG's materials actually reached the Sonora site, *see Distler*, 803 F.Supp. at 51.

### IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF RECOVERABILITY OF RESPONSE COSTS

Defendants Omnisource, K & R, and TMG have moved for summary judgment as to the recoverability of response costs incurred at the sites. The parties do not dispute the material facts regarding this issue; rather, their dispute lies in the inferences to be drawn from these facts. Because this is a motion for summary judgment by Defendants, the Court makes all reasonable inferences in favor of the government.

■ CERCLA makes responsible parties liable for "all costs of removal or remedial action incurred by the United States ... not inconsistent with the national contingency plan [NCP]."[16] 42 U.S.C. § 9607(a)(4)(A); *see United States v. Hardage*, 982 F.2d 1436, 1443 (10th Cir.1992) ("if the government's response actions are in harmony with the NCP, the costs incurred by those actions are recoverable from responsible parties"), *cert. denied*, 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993). The EPA's decision to institute a response action and the choice of the particular action is discretionary. *Hardage*, 982 F.2d at 1442 (citing *United States v. Northeastern Pharmaceutical & Chemical Co., Inc.*, 810 F.2d 726 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987)).

■ The Court is required to give some deference to the EPA's decision because "determining the appropriate removal

16. The NCP consists of procedural and substantive guidelines issued by the EPA governing CERCLA cleanup actions. *See Colorado v. Idarado Mining Co.*, 916 F.2d 1486, 1488–89 (10th Cir.1990). The NCP, which is set out in full at 40 C.F.R. Part 300, *et seq.*, is meant to present a general plan or framework for responding to hazardous substances releases; it is not intended to provide complex and detailed site-specific decisionmaking criteria. 50 Fed.Reg. 47, 912, 47, 920 (1985).

and remedial action involves specialized knowledge and expertise, [and therefore] the choice of a particular cleanup method is a matter within the discretion of the EPA." *Id.* As such, even if the Court would have made a different decision regarding the proper action to be taken, the decision of the EPA will not be found to be inconsistent with the NCP unless it is in contravention of the NCP guidelines. Courts are required to uphold the EPA's response decision "unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with the law." 42 U.S.C. § 9613(j)(2); *In re Bell Petroleum Serv. Inc.,* 3 F.3d 889, 905 (5th Cir.1993).

> The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational explanation between the facts found and the choice made.... In reviewing that explanation, [the Court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a *clear error of judgment.*

*Bell Petroleum,* 3 F.3d at 905 [emphasis added] In determining compliance with the NCP, the Court will apply the version of the NCP in effect at the time the EPA conducted its response.

■ As previously discussed, while inconsistency with the NCP is not a defense to CERCLA liability, it may serve to limit the amount of damages for which defendants may be liable. *United States v. Kramer,* 757 F.Supp. 397, 436 (D.N.J.1991); *United States v. Mottolo,* 695 F.Supp. 615, 630 (D.N.H. 1988); *see also Hardage,* 982 F.2d at 1445 (defendant who is declared liable for response costs may still challenge those costs as unrecoverable because the underlying response actions giving rise to the costs are inconsistent with the NCP). The burden is on defendants to show that the costs incurred by the government are inconsistent with the NCP. *United States v. American Cyanamid Co.,* 786 F.Supp. 152, 161 (D.R.I.1992). To show inconsistency with the NCP, the defendant must point to a specific provision in the NCP with which a specific response action is inconsistent. *Id.*

■ Notably, variance with the NCP will not necessarily be a complete defense to recovery of costs. *O'Neil v. Picillo,* 682 F.Supp. 706, 729 (D.R.I.1988), *aff'd,* 883 F.2d 176 (1st Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990). Defendants must show that the cleanup caused by the variance with the NCP resulted in excess costs for which they should not be found responsible. *Id.*

■ Defendants allege that the EPA's entire response action was inconsistent with the NCP. Supporting this allegation, Defendants first maintain that the EPA Action Memorandum conditioned a removal action on a finding of levels of hazardous substances in the soil that were high enough to classify the soil as hazardous wastes and that these levels were not found. The Action Memorandum cited by Defendants is the "Sonora Action Memorandum." *See* Dkt. 144, Exhibit G. "Hazardous waste" is mentioned only one time in the memorandum and it is apparent that a response action was not "conditioned" on finding hazardous wastes at the site. Rather, the response action was undertaken to remove the specified hazardous substances—lead, barium and PCBs. Furthermore, this argument has no bearing upon any provision or requirement of the NCP and therefore cannot stand as a basis for an NCP inconsistency argument.

■ The more powerful argument for inconsistency with the NCP lies in Defendant's alternate claim that the EPA conducted a "remedial" rather than a "removal" action. Defendants argue that, as a remedial action, the EPA's choice of remedy was arbitrary and capricious because 1) the EPA failed to follow NCP regulations requiring a remedial investigation and feasability study [17]; 2) the EPA incurred excess cleanup costs when it mixed excavated soil with piles of ash containing a much higher percentage of hazardous substances; and 3) the EPA incurred excess cleanup costs without justification

---

17. An RI/FS includes a detailed alternatives analysis in which cost must be considered.

when it decided to expose of the treated soil and ash off-site landfill rather than replacing it into the on-site excavation areas.

In analyzing this argument, the Court must first determine whether the EPA's response action was a "remedial" or "removal" action. Both the CERCLA statute and regulations distinguish between response actions that are "removal" actions and those that are "remedial." These distinctions become highly important when examining the EPA's actions and their consistency with the NCP because the type of action determines the nature and complexity of the regulations governing the response. Remedial actions are subject to a much higher degree of regulation than removal actions. In determining the appropriateness of a removal action, the NCP requires consideration of eight specific factors.[18] By contrast, the NCP requires a detailed analysis of alternatives for a remedial action giving consideration to nine specific evaluation criteria, including overall protection of human health and the environment, long-term effectiveness and permanence, reduction of toxicity, mobility or volume through treatment and cost. 40 C.F.R. 300.430(e)(9)(iii). The regulation further declares that "[o]nly those releases included on the NPL [19] shall be considered eligible for Fund-financed remedial action." 40 C.F.R. 300.425(b)(1).

CERCLA defines a "remedial" action as follows:

The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazard-

ous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate, and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(24).

CERCLA defines a removal action, in part, as follows:

(vi) Threat of fire or explosion;
(vii) The availability of other appropriate Federal or State response mechanisms to respond to the release;
(viii) Other situations or factors which may pose threats to public health or welfare or the environment.

40 C.F.R. § 300.65(b)(2) (1985); 40 C.F.R. § 300.415(b)(2) (1989). The parties do not dispute that the administrative record sufficiently documents that the EPA considered these statutory factors.

---

**18.** In this respect, the NCP provides that the lead agency shall consider:

(i) Actual or potential exposure to hazardous substances or pollutants or contaminants by nearby populations, animals or food chain;
(ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;
(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;
(iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;
(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

**19.** National Priorities List. The NPL is the list of priority releases for long-term remedial evaluation and responses. 40 C.F.R. § 415(b).

The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals ...

42 U.S.C. § 9601(23).

Defendants maintain that the protracted nature of the EPA's response indicates that there was no emergency situation and no imminent threat to health or safety and, therefore, the action was a remediation rather than a removal. Defendants maintain that the distinction between removal and remedial actions focuses on the permanence or impermanence of the action and on whether emergency action is necessary. *See Bell Petroleum*, 3 F.3d at 894 ("removal actions are generally immediate or interim responses and remedial actions generally are permanent in nature"); *Versatile Metals, Inc. v. Union Corp.*, 693 F.Supp. 1563, 1577 (E.D.Pa.1988) (even though immediate actions were taken at the time contamination was discovered, the action was remedial because the overall response was lengthy and permanent). Defendants contend that there was no emergency because the EPA knew of the release in 1985 but did not act until 1989. Furthermore, Defendants assert that the delay between excavation and subsequent treatment and off-site disposal of the excavated soil precludes finding that an emergency existed at the sites.

The EPA, on the other hand, maintains that its actions at the sites were removals. First, the EPA cites courts that have rejected the argument that only short-term, temporary responses can be considered removals, finding that the permanence or temporary nature and length of time for response is not dispositive of the characterization issue. *See General Electric Co. v. Litton Indus. Automation Systems, Inc.*, 920 F.2d 1415, 1419 n. 4 (8th Cir.1990) (where cleanup took little more than a year, response was not too time consuming to be considered a removal; an excavation that totally and permanently cleans up a hazardous site can still be classified as a removal action), *cert. denied*, 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991); *United States v. Amtreco*, 846 F.Supp. 1578, 1582 (M.D.Ga.1994) (rejecting argument that removals can only be short-term, temporary actions); *Con–Tech Sales v. Cockerham*, 1991 WL 209791 at *7–8 (E.D.Pa.1991) (distinguishing characteristic of a removal action is the need for speedy action rather than the temporary or permanent nature of the remedy; length of time is not dispositive of the characterization issue; removals need not be limited to short term, temporary responses).

Furthermore, the EPA cites federal regulations eliminating the distinction between immediate and planned removal actions arguing that this indicates the imminency of a situation is no longer dispositive of the characterization issue. Prior to 1985, federal regulations distinguished between immediate and planned removals. *See* 40 C.F.R. § 300.65–67 (1984). Procedures for immediate removal actions applied in imminent, emergency situations, whereas more detailed procedures applied to planned removals, which involved less imminent releases and threats of releases.

Several factors motivated the decision to eliminate this distinction. First, the distinction between sites eligible for immediate removal and those eligible for planned removal was often difficult to define in practice. 40 Fed.Reg. 5863 (1985). Furthermore, "[t]ime spent in properly classifying actions, and documenting the 'immediacy' and 'significance' of the risk to health or the environment [delayed] necessary response and consume[d] significant amounts of staff and decisionmakers' energies." *Id.*

Second, in many cases the existing provisions did not provide an effective mechanism

for addressing threats which were not "immediate and significant," especially for sites which were not listed or eligible for listing on the NPL. *Id.* The EPA felt that the increased administrative requirements placed on planned removals were causing delays which ultimately could increase the problems and costs to remedy the situation at a particular site. *Id.* ("To the extent that necessary removal efforts are delayed and site conditions deteriorate, the present provisions may lead to a long-term increase in expenditures").

Thereafter, the NCP standard for removal actions was changed to encompass all circumstances which would have been addressed either as immediate or planned removal actions. *Id.* The NCP standard in effect at the time the present action was commenced provided that "the lead agency may take any appropriate action to '*abate, minimize, stabilize, mitigate or eliminate the release or threat of release*' in initiating a removal action." 40 C.F.R. § 300.65(b)(1) (1986) (emphasis added).

Finally, the EPA urges the Court to heed CERCLA policy in characterizing its response. The Sixth Circuit has interpreted that a "removal" action be "given a broad interpretation." *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 843 (6th Cir. 1994). Also, the Sixth Circuit has stated that the "all costs incurred" language of CERCLA, together with the statutes "broad remedial purpose," support a liberal interpretation of recoverable costs. *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1503 (6th Cir. 1989), *cert. denied*, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990).

In opposing a "remedial" characterization, the EPA admits that it began monitoring the sites in 1985, but maintains it was not until 1988 that it was informed by the KDEP that soil test results indicated high concentrations of lead and, more importantly, that the sites were located in highly karstic regions. EPA argues that the NCP factors did not weigh in favor of a response action until this information was known. The EPA further asserts that the delay between the 1989 excavation and the 1991 treatment and off-site disposal was necessary in order to ascertain the best method for treatment and disposal of the excavated soil.

Based on a review of the administrative record, the statute, regulations and relevant case law, the Court finds the entire EPA response in this matter a removal action under CERCLA and the NCP. In making this determination the Court places significant weight upon several factors. First, the 1989 Action Memoranda for the sites adequately documents the basis for the EPA's decision that conditions at the sites posed a substantial, immediate threat to human health and the environment. The EPA proposed to address the problem by excavating and disposing of the contaminated soil at the sites. This is precisely what the EPA proceeded to do.

In addition, the definition of a "removal" action plainly provides for the removal of released hazardous substances and the disposal of removed material. *See* 42 U.S.C. § 9601(23). Thus, although there is some overlap between the statutory definitions of "removal" and "remedial" actions, excavation and off-site transport of contaminated soil may be characterized as a removal action. *See* 42 U.S.C. § 9601(23) (removal means the cleanup or removal of released hazardous substances from the environment); *see also General Electric Co. v. Litton Indus. Automation Systems, Inc.*, 920 F.2d 1415, 1419 (8th Cir.1990), *cert. denied*, 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991). Likewise, the Court is not convinced that the length of time, *see United States v. Amtreco*, 846 F.Supp. 1578, 1582 (M.D.Ga.1994), or permanency of the remedy, *see Litton*, 920 F.2d at 1419 n. 4 (rejecting argument that an excavation that totally and permanently cleans up a hazardous waste site never can be classified as a removal action), necessarily precludes a finding that the EPA conducted a removal action at the sites. Finally, in view of the deferential framework established by CERCLA for cost recovery by the United States, the Court does not feel constrained to otherwise interpret the EPA's response, particularly where the record adequately documents continuing risk to human health and the environment pending treatment and disposal of the contaminated soil.

Having characterized the EPA's response as a removal action, the Court finds Defen-

dants' arguments relating to inconsistency with the NCP's requirements for remedial actions moot. Defendant's do not raise any arguments regarding inconsistency with the NCP's requirements for removal actions.

The Court having thoroughly reviewed the matter, having set forth its views above, and being otherwise sufficiently advised,

**IT IS HEREBY ORDERED:**

1. That the United States' Motion [DN92] regarding K & R Corporation d/b/a Tri–City Scrap Co. and Omnisource Corporation's liability for response costs at the Carlie Middleton and Sonora sites is **granted.**

2. That the United States' Motion [DN92] on the issue of TMG Enterprises, Inc.'s liability for response costs at the Carlie Middleton Site is **granted.**

3. That TMG Inc.'s Motion [DN 118] on the issue of its liability for response costs at the Sonora site is **granted.** Accordingly, the United States' Motion [DN92] regarding TMG Enterprises, Inc.'s liability for response actions at the Sonora site is **denied.**

4. That Defendants Omnisource Corporation [DN 122] and K & R Corporation d/b/a/ Tri–City Scrap Company's [DN 119] Motions on the issue of liability/recoverability of response costs at the Sonora and Carlie Middleton sites are **denied.**

5. That Defendant TMG's Motion [DN 118] on the issue of liability/recoverability of response costs at the Carlie Middleton site is **denied.**